ROBERT CHARLES LAMB, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 51457

March 3, 2011                                        251 P.3d 700

---

*Philip J. Kohn*, Public Defender, and *Kristine M. Kuzemka* and *Nancy Lemcke*, Deputy Public Defenders, Clark County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, *Steven S. Owens*, Chief Deputy District Attorney, and *Marc P. DiGiacomo*, Deputy District Attorney, Clark County, for Respondent.

Before DOUGLAS, C.J., PICKERING and HARDESTY, JJ.

## OPINION

By the Court, PICKERING, J.:

Robert Lamb appeals his conviction of the first-degree murder of his sister, Susan. He identifies a multitude of errors, from his first encounter with the police, through pretrial proceedings, jury selection, and trial, to the mishandling of a jury note during deliberations and, finally, sentencing. For the reasons below, we conclude that: (1) the public safety exception to the *Miranda* rule made admissible Lamb's unwarned statement to the police that ''I have a revolver, but I found it''; (2) Lamb's claims of pervasive procedural, evidentiary, and instructional error fail; and (3) it was error for the bailiff to communicate with the jury concerning its question without notice to the parties, but in this case the error was non-prejudicial. We therefore affirm.

### I.

### BACKGROUND FACTS

Susan Bivans was shot eight times with a .22 caliber revolver in the parking lot outside her daughter's grade school. The assailant left on foot without taking Susan's purse or other belongings. Her

husband, Stuart Bivans, met with police at the scene. Asked whether Susan had any enemies, Stuart said that she was terrified of her brother, Robert Lamb, who blamed Susan for their parents disowning him. Lamb's height, weight, and age matched witness accounts of the assailant's.

The evidence at trial, much of it Lamb's own writings, was circumstantial but compelling. It told the story of a desperately disturbed man, one obsessed with his sister and his jealousy over her relationship with their parents. His journals include statements like, "Intimidated, humiliated, oppressed, because Susan took control of parents and the money"; "Evil actions have consequences. You are selfish and greedy. Susan, it will be interesting how it plays out"; and "A cat fight between whores. . . . Sus[an] is so mean to me [because s]he resented that dad loved me and mom. My mission finding out [dad], Sus[an], money[,] lies. . . . Being dead does not absolve them of everything."

Lamb did not just write about his sister. He also wrote to her and called and came to her home to berate her. His obsession worsened after he tried but failed to have himself appointed their parents' guardian. Then, not long after, Lamb's father died, disinheriting him.

Lamb's journals chronicle his surveillance of Susan's life, the cars she drove, their license plate numbers, and when and where her daily routines took her. Among his belongings was a bestselling mystery, *Mortal Prey*, from which he hand-copied excerpts, including the fictional killer's rumination about there being "blood . . . on their hands and I will wash it off," which he revised to "Blood on Susan's hands. I will wash it off." The State maintained that Lamb scripted Susan's murder from this book, down to weapon choice, kill site, off-site parking, disguises, and how to dispose of the gun. He also researched Nevada's homicide and concealed weapon laws, its prisons, and the Las Vegas criminal defense bar.

Lamb had a concealed weapon permit and several 9 millimeter guns but no .22 caliber revolver. His apartment was a short drive from the school where Susan was shot. A security camera showed Lamb's Izusu Rodeo pulling into the apartment complex soon after the shooting. Evidence collected from Lamb's apartment and SUV included a cleaning brush for a .22 caliber weapon, binoculars, face makeup, and the remains of a home haircut and dye job. When he was arrested, Lamb's hair had been crudely cut and colored.

Lamb mounted a two-pronged defense at trial. First, he argued that the State hadn't met its burden of proving that he was Susan's killer because the murder weapon was never found and no forensic evidence linked him to the crime. Second, he maintained that

the police bungled the investigation and let the real killer go free. Pressed to name possible enemies of Susan's besides Lamb, Stuart offered the name of Earl Cottrell, a friend's ex-husband. (The Cottrells' divorce was contentious, and Susan had sided with her friend.) Lamb seized on this and proffered Cottrell as a much likelier killer than himself. He thought it significant that the Cottrells' and Bivanses' daughters went to the same school, that Susan was shot on a Wednesday, and that Cottrell took his daughter to school on Wednesdays.

## II.

## DISCUSSION

### A. *Fifth Amendment and Miranda challenges*

Lamb first appeals the denial of his motion to suppress statements he made to the police in the field and later at the police station, before receiving *Miranda* warnings. He also asserts that the State's cross-examination of him violated the Fifth Amendment because it went beyond impeachment to improper comment on his exercise of the right to remain silent. As to the motion to suppress, we review the district court's legal conclusions de novo and its factual findings for clear error. *Rosky v. State*, 121 Nev. 184, 190, 111 P.3d 690, 694 (2005). Lamb did not object to the cross-examination questions he now challenges, so plain error review applies to them. *Gaxiola v. State*, 121 Nev. 638, 653, 119 P.3d 1225, 1236 (2005).

#### 1. *Lamb's statements to the police*

Lamb had a series of encounters with the police, each producing statements later used against him at trial. The first encounter occurred at Lamb's apartment complex. Susan was shot just after 8 a.m. Within hours, a surveillance team had been set up outside Lamb's apartment. Around 1 p.m., a man fitting Lamb's description came out carrying a Hefty trash bag. He seemed to be headed toward a dumpster, then paused, looked around, and went to Lamb's SUV, opened its door, and put the bag inside. The police approached, several with handguns drawn, and ordered the man to the ground. One officer handcuffed him while another explained that he was not under arrest but needed to be detained. When asked his name, the man replied, ''I don't know, I bumped my head.'' Asked if he had identification, the man nodded toward his wallet. In the wallet was a driver's license confirming the man was Lamb.

The takedown occurred before the police, who were waiting on a warrant, had swept or secured Lamb's apartment. Not knowing who or what might be inside, or where Lamb might have put the

gun if he was the shooter, an officer asked Lamb if there were any people, dogs, or weapons in the apartment that could cause them injury. Lamb answered "no" to the first two questions and said, "I have a revolver, but I found it" in response to the third.

At this point, the officers stopped speaking to Lamb and telephoned the lead detective, Lance Gibson, for direction. On Gibson's instructions, they said nothing more beyond asking Lamb if he would come to the Henderson police station to be interviewed. Lamb replied, "I don't want to but I will."[1] At the station, Gibson introduced himself to Lamb and said, "I'm here to talk to you about a killing of a woman named Susan." Lamb's response was "I don't know anybody named Susan."[2] Gibson followed up with "you don't know anybody by the name of Susan?" to which Lamb responded, "Susan Goddard?" (Lamb's sister's last name was Bivans and never had been Goddard.) Gibson then advised Lamb of his *Miranda* rights; he also offered Lamb medical attention, which Lamb declined. Lamb stated, "I'm not going to answer questions without a lawyer, but I'll listen to what you have to say." Thereafter, Gibson showed Lamb a picture of Susan, prompting Lamb to say, "Pretty lady. She's the one who is dead?"

Lamb was arrested and transported to the Henderson jail for booking. When asked his name and other routine intake questions, Lamb initially said he couldn't remember. After learning that this meant he would be processed as a John Doe, a longer, more involved process, Lamb recovered his memory and provided his name, social security number, and other biographical information.

### 2. *Public safety exception*

Lamb's motion to suppress sought to exclude his statement to the police that "I have a revolver, but I found it" as the product of custodial interrogation not preceded by the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). The district court agreed that the statement was unwarned and resulted from custodial interrogation. However, it held that *Miranda* did not require its exclusion because the "public safety" exception recognized in *New York v. Quarles*, 467 U.S. 649, 657-60 & n.9 (1984), applied. Although this court has not previously addressed *Quarles* in a published opinion, we agree.

---

[1] Detective Gibson testified at the suppression hearing that he would have come to the apartment complex and spoken to Lamb there if Lamb had refused to go to the station.

[2] Although the record reflects that Gibson's interview with Lamb was videotaped and that the videotape was played at the suppression hearing, it was not transcribed or included in the record on appeal. The quotes in the text are from the transcript of the suppression hearing, where the lawyers and the court repeated what was said on the videotape.

The "public safety" exception permits police officers to "ask a suspect questions without first giving *Miranda* warnings if they reasonably believe it is 'necessary to secure their own safety or the safety of the public.' " *United States v. Are*, 590 F.3d 499, 505 (7th Cir. 2009) (quoting *Quarles*, 467 U.S. at 659). In *Quarles*, a woman told police she had just been raped at gunpoint and that her attacker, whom she described, had just entered a nearby supermarket. 467 U.S. at 651-52. The police apprehended the suspect in the market, wearing an empty shoulder holster. *Id.* at 652. After handcuffing him, but with no *Miranda* warning, the officers asked the man where the gun was. *Id.* He told them it was "over there," and the police found it in an otherwise empty carton in the area indicated. *Id.* The Supreme Court reversed the state court's suppression of the statement and the gun based on the "public safety" exception. *Id.* at 659-60.

Since Quarles's statement about the gun was unwarned, *Miranda* required its exclusion, a result the Court deemed unacceptable as a matter of public policy. "Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost." *Quarles*, 467 U.S. at 657. However, "if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding." *Id.* Given the "danger to the public safety" of a gun remaining "concealed somewhere in the supermarket" where "an accomplice might make use of it, [or] a customer or employee might later come upon it," the societal cost of requiring a warning before asking the suspect about the gun's whereabouts was "something more than merely the failure to obtain evidence useful in convicting Quarles." *Id.* Thus, *Quarles* held the unwarned statement admissible, because "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic [*Miranda*] rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.*

Here, the officers knew that Lamb was a suspect in a homicide involving a gun. They had not secured his apartment or his car, did not know if his apartment was accessible to others, and did not know if he had an accomplice inside the apartment or on the grounds. He walked out with a large black trash bag and carried it through the apartment complex's public areas. Before he emerged, the officers were waiting on a warrant and had been preparing to enter his apartment, either on a protective sweep or to execute the

imminent warrant. According to the officers who testified at the suppression hearing, they asked Lamb about people, dogs, or weapons in the apartment out of concern for the safety of the officers about to go into the apartment and the safety of anyone inside. The district court accepted these concerns as objectively reasonable. It concluded that "the officers have a right for their own safety and the safety of possible other individuals to inquire as to very basic things [such] as who else is in [the] apartment, if anyone? Are there animals or weapons?" and that, under *Quarles*, the statement, "I have a revolver, but I found it," was admissible, despite the lack of *Miranda* warnings.

Lamb is right that his case differs from *Quarles* in that here, the stated concern was with the safety of officers about to enter, or people who might be inside, a private apartment, whereas in *Quarles*, the Court's concern was that a citizen might be harmed by an unattended weapon in a public supermarket. But *Quarles* covers officer safety, as well as public safety. "While the facts in *Quarles* raised the specter of danger to the public, the public safety exception clearly encompasses questions necessary to secure the safety of police officers," so long as the questioning (1) " 'relate[s] to an *objectively* reasonable need to protect the police or the public from any immediate danger,' " and (2) is not "investigatory in nature or 'designed solely to elicit testimonial evidence from a suspect.' " *United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (Sotomayor, Cir. J.) (quoting *United States v. Newton*, 369 F.3d 659, 677 (2d Cir. 2004), and *Quarles*, 467 U.S. at 658-59 & n.8). The public safety exception is "narrow," *Quarles*, 467 U.S. at 658, but it does not depend on the distinction between officer safety and public safety suggested by Lamb. Rather, its limits derive from "the exigency which justifies it" and the distinction "between questions necessary to secure their [police officers'] own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 658-59.

Lamb argues that since he was in handcuffs and out of the apartment he posed no threat to the officers or the public. If the officers had already swept the apartment and secured it and any occupants, this argument would have more teeth. *See United States v. Brathwaite*, 458 F.3d 376, 382 n.8 (5th Cir. 2006) (public safety exception did not sanctify unwarned questions agents asked a suspect about weapons in his home when they had already performed two protective sweeps, handcuffed both residents and were executing a search warrant). In this case, however, the apartment and its outside areas had not been swept; Lamb was a suspect in a recent fatal shooting; he had a concealed weapon permit; and the officers did not know who else might be in or near the apartment.

While the question is close, we agree with the district court that Lamb being handcuffed did not neutralize the emergent risk to the police of the protective sweep and/or search they were about to conduct, or convert their quick questions about people, dogs, or weapons from self-protective to investigatory. *See United States v. Are*, 590 F.3d 499, 506-07 (7th Cir. 2009) (under *Quarles*, a cuffed defendant's unwarned statement in answer to a question about weapons in his unsecured home was admissible; "even when a quick protective search of a residence is conducted, the potential presence of an undiscovered but dangerous individual with access to a weapon cannot be discounted," also noting the defendant's history of weapons offenses); *United States v. Williams*, 181 F.3d 945, 953-54 (8th Cir. 1999) (similarly holding admissible an unwarned statement by a cuffed defendant about a gun he had: "the officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time [or] whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way"); *see also United States v. Estrada*, 430 F.3d 606, 613 (2d Cir. 2005) (holding a defendant's answer to an officer's question about the presence of guns in an apartment about to be searched admissible; the questions "were narrow in scope, directly targeting the safety concern, and were not posed to elicit incriminating evidence. Rather, given that the apartment had not been secured at the time of the questioning, the questions were aimed at controlling a potentially dangerous situation and relieving an immediate threat to the officers' safety").[3]

### 3. *Identification and booking questions*

Lamb next challenges the admissibility of his responses to the booking questions asked him at the Henderson jail. He waived this challenge at the suppression hearing—appropriately, given the booking questions exception recognized by the Supreme Court in *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990), and this court in *Nika v. State*, 113 Nev. 1424, 1438-39, 951 P.2d 1047, 1056-57 (1997), *overruled on other grounds by Leslie v. Warden*, 118 Nev. 773, 780, 59 P.3d 440, 445 (2002). Whether that waiver extended to Lamb's responses to the police's initial requests for identification in the apartment parking lot is unclear. Assuming no waiver, we nonetheless do not perceive the "unusual circumstances" that would make his response to the officers' field requests for identi-

---

[3]The State also argues that the error, if any, was harmless, since the murder weapon was never recovered and no revolver was found in Lamb's apartment.

fication incriminating and hence inadmissible because unwarned. *Hiibel v. Sixth Judicial Dist. Court of Nev. Humboldt Cty.*, 542 U.S. 177, 191 (2004).[4]

### 4. *Lamb's impeachment on cross-examination*

The district court deemed Lamb's statement that "I'm not going to answer questions without a lawyer, but I'll listen to what you have to say," an adequate invocation of his right to remain silent. Lamb denied knowing his sister to Detective Gibson both before and after invoking his right to remain silent. The State did not use either statement in its case-in-chief. However, after Lamb took the stand and testified in his own defense (against the advice of counsel), the State used his denials as impeachment, suggesting his amnesia was feigned.

It would be "an extravagant extension of the Constitution" to hold that *Miranda* immunizes perjury from impeachment with prior inconsistent statements. *Harris v. New York*, 401 U.S. 222, 225-26 & n.2 (1971). Thus, statements elicited in violation of *Miranda* may be used to impeach a defendant's inconsistent trial testimony, provided the statements are not involuntary within the meaning of the Fifth Amendment. *Id.*; *see Johnson v. State*, 92 Nev. 405, 407, 551 P.2d 241, 242 (1976). However, the State cannot use a person's silence after receiving *Miranda* warnings as impeachment. *Doyle v. Ohio*, 426 U.S. 610, 618 (1976).

In his direct testimonial narrative, Lamb averred that he loved his sister; that "I've always loved her"; that the real "tragedy" is that "[t]here's a mad man out there" who has not been caught; and that "the police never offered me the courtesy that morning of a telephone call and to come by and visit with me that morning and say my sister was brutally murdered," though "[t]hey did to Stu," her husband. On cross-examination, Lamb admitted that, when interviewed at the station, he pretended he didn't know his sister's name or recognize her picture:

> [The State]: You indicated to the police [that] you didn't even know who your sister was?
>
> [Lamb]: I wasn't going to cooperate with the police.

---

[4]We also reject Lamb's argument, citing *Jackson v. Denno*, 378 U.S. 368, 376 (1964), and *Passama v. State*, 103 Nev. 212, 213, 735 P.2d 321, 322 (1987), that the district court erred in rejecting his voluntariness challenge as to his unwarned statements. Lamb concedes that no deceit or trickery was practiced on him and cites no authority for the proposition that a statement made to officers while in handcuffs is per se coerced (and ignores abundant contrary precedent). Also significant are the facts that Lamb later declined the medical assistance offered and was able to answer routine booking questions when he learned it was in his interest to do so.

Driving the point home, the State then asked, "As opposed to ac-. tually having some sort of memory problem you intentionally chose not to provide the information to the police?" to which Lamb responded, "I was praying. I wasn't going to answer their questions."

Lamb did not object to any of these questions but nonetheless argues on appeal that they amounted to constitutionally impermissible comment on his exercise of his right to remain silent. We disagree. The statements were neither involuntary, *see supra* note 4, nor can we conclude, applying plain error review, that the State went beyond fair impeachment to improper comment on Lamb's right to remain silent. *Gaxiola v. State*, 121 Nev. 638, 656, 119 P.3d 1225, 1237 (2005). Lamb did not remain silent; he professed not to know or recognize his sister. This was inconsistent with his trial testimony and legitimate impeachment.

B. *Jury selection*

1. *Voir dire*

Lamb appeals the district court's refusal of his request for a jury questionnaire and restriction of voir dire. "Decisions concerning the scope of voir dire and the manner in which it is conducted are reviewable only for abuse of discretion," *Hogan v. State*, 103 Nev. 21, 23, 732 P.2d 422, 423 (1987), and draw "considerable deference" on appeal. *Johnson v. State*, 122 Nev. 1344, 1355, 148 P.3d 767, 774 (2006).

Lamb's proposed jury questionnaire would have asked the venire about news coverage of the killing, by then several years in the past. The district court preferred to address this orally rather than by questionnaire, and conducted individual voir dire of the four panel members who acknowledged having heard or read about the killing. Proceeding this way did not amount to an abuse of discretion.

Quoting NRS 175.031, Lamb also complains that the district court "unreasonably restricted" his voir dire. "The purpose of jury voir dire is to discover whether a juror will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Johnson*, 122 Nev. at 1354, 148 P.3d at 774 (quotations omitted). A fair reading of the record repels Lamb's claim the district court abused its discretion in managing voir dire. It simply limited questions "aimed more at indoctrination than acquisition of information" concerning bias or ability to apply the law, *Hogan*, 103 Nev. at 23, 732 P.2d at 423, while preserving Lamb's right to a fair-minded jury. This was not an abuse of discretion.

## 2. *Batson challenge*

During jury selection, the State used one of its peremptory challenges to dismiss an African-American juror. Lamb objected under *Batson v. Kentucky*, 476 U.S. 79 (1986). As its race-neutral justification, the State offered the fact that the juror had arrived late to court that morning. Lamb countered with only his personal belief that an African-American juror might distrust the government and favor the defense and the observation that the State did not question the juror about his tardiness. The district court accepted the State's explanation as race neutral and found that the defense had not shown pretext or purposeful discrimination. *Diomampo v. State*, 124 Nev. 414, 423, 185 P.3d 1031, 1036 (2008) (analyzing *Batson* challenges under the three-part test in *Purkett v. Elem*, 514 U.S. 765, 766-67 (1995)). A decision " 'on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal,' " *Walker v. State*, 113 Nev. 853, 867-68, 944 P.2d 762, 771-72 (1997) (quoting *Hernandez v. New York*, 500 U.S. 352, 364 (1991)), and we affirm the rejection of Lamb's *Batson* challenge.

## C. *Evidence of restraining orders and threats*

Considerable unobjected-to evidence established Lamb's obsession with Susan, his belief that she had robbed him of their parents' love and money, his threat to "bash her face in" if she did not give him "his fair share of their parents' money," and his plans for revenge. Although conceding the legitimately admissible evidence, the defense told the State that Lamb did not accept and wanted to be heard on the admissibility of the following: (1) that Susan had obtained a restraining order against Lamb; and (2) that Susan had told her husband many times that she feared Lamb would shoot her. The State informally agreed that this evidence should not come in without, as to the former, advance permission from the court and, as to the latter, a basis on which to overcome Lamb's hearsay objection. Despite this, two of the State's witnesses mentioned these subjects with no advance ruling, from which Lamb appeals.

The restraining order came up during the State's examination of Susan's best friend. The State asked, "Were you ever present when [Lamb] showed up unannounced at Susan's house?" The witness answered, "Yes, I was. It was after there had been a restraining order. I know I'm jumping now. I can tell you that it was after there was a restraining order." Lamb objected and, after an unreported colloquy at the bench, the jury was instructed that "there was no restraining order per se issued in this matter re-

ferred to earlier. It was an oral report of harassment that was re-
duced to a police report at some point." Nothing else was said
about it.

We do not agree with the State that the restraining order was ad-
missible to show Susan's state of mind: Lamb did not assert self-
defense; Susan's state of mind several years earlier, when she ap-
plied for a restraining order against her brother, was not in issue.
*See Shults v. State*, 96 Nev. 742, 751, 616 P.2d 388, 394 (1980)
(murder victim's statement of his fear of defendant was not ad-
missible as non-hearsay under the state-of-mind exception in NRS
51.105(1) where the defendant did not claim self-defense, acci-
dental death, or suicide). The State should have instructed its wit-
nesses not to allude to it. *See People v. Warren*, 754 P.2d 218,
224-25 (Cal. 1988) ("A prosecutor has the duty to guard against
statements by his witnesses containing inadmissible evidence. If the
prosecutor believes a witness may give an inadmissible answer dur-
ing his examination, he must warn the witness to refrain from
making such a statement."). Nonetheless, the restraining order ap-
pears to have been blurted out by a nervous witness, rather than so-
licited by the State, and the court's corrective instruction, such as
it was, followed immediately. *See Sterling v. State*, 108 Nev. 391,
395, 834 P.2d 400, 402 (1992) ("inadvertent references to other
criminal activity not solicited by the prosecution, which are blurted
out by a witness, can be cured by the trial court's immediate ad-
monishment to the jury to disregard the statement"). Thus, we
conclude that the restraining order's passing and immediately qual-
ified mention was harmless. *Id.* It would be unreasonable to con-
clude otherwise, given the overwhelming proof of Lamb's tor-
tured relations with his sister—evidence that included Susan's
directive to Lamb never to call or come to her home; his volumi-
nous writings showing he staked out her home, spied on her, and
fantasized about revenge; his failed litigation attempt to be ap-
pointed their parents' guardian; and his bitterness at being dis-
owned, for all of which Lamb blamed Susan.[5]

The evidence concerning Susan's statements to her husband,
Stuart, that she feared that Lamb would shoot her came out dur-
ing Stuart's testimony about a call he partially overheard between
Susan and Lamb. Stuart testified that, by the end of the call,
Susan was shaking and crying uncontrollably because Lamb had

---

[5]Lamb asserts error in connection with this witness's testimony about an al-
tercation she overheard between Lamb and Susan that left Susan sobbing over
what she told her friend was "[a] scary threat." Defense counsel neither ob-
jected to this statement nor argued its admission was plain error; thus we de-
cline to address it. *See Moore v. State*, 122 Nev. 27, 36-37, 126 P.3d 508, 514
(2006) ("[f]ailure to object during trial generally results in a waiver thereby
precluding appellate consideration of the issue").

threatened to "bash her face in." Lamb did not object to this testimony, which the State had also presented at the preliminary hearing. Lamb conceded that it was admissible under NRS 51.095, the "excited utterance exception" to the hearsay rule, *see Hogan*, 103 Nev. at 23, 732 P.2d at 423; he did not invoke NRS 48.045 or argue that Lamb's threat should be excluded as improper character or "prior bad acts" evidence.

At trial, Stuart's testimony about Susan's call with Lamb did not stop at Lamb's threat to "bash her face in." He added: "She was scared. She was scared whenever he got into these screaming modes. She had many times told me that she thought one day he would shoot her." Lamb objected, and a hearing outside the presence of the jury was held.

The court found that the State and Lamb had both been surprised by Stuart's testimony. Questioned outside the jury's presence, Stuart testified that, when Susan told him about Lamb threatening to "bash her face in," she also said she thought he was going to shoot her, and that she was crying and visibly shaken throughout. This testimony led Lamb to concede that Susan's statement following that particular call about fearing Lamb would shoot her qualified for admission as an excited utterance, obviating his earlier hearsay objection in that context. However, Lamb argued that there was no non-hearsay basis for Stuart to globalize this testimony to Susan telling him "many times" that she feared Lamb would shoot her. The court sustained Lamb's objection and instructed Stuart that, when the jury returned and he resumed his testimony, he could not relate other instances in which Susan had expressed this fear to him. At Lamb's request, the court further ordered that Lamb would be permitted to establish that, while Stuart had testified before about Lamb's call threatening to bash Susan's face in, he hadn't mentioned her saying she was afraid Lamb was going to shoot her. Lamb made no argument then under NRS 48.035 or NRS 48.045(2) about this evidence, and accepted the district court's solution by cross-examining Stuart on his inconsistent accounts of Susan's report to him of her traumatic telephone conversation with Lamb.

The "failure to specifically object on the grounds urged on appeal preclude[s] appellate consideration on the grounds not raised below," *Pantano v. State*, 122 Nev. 782, 795 n.28, 138 P.3d 477, 485 n.28 (2006), unless the defendant demonstrates plain error. *Moore v. State*, 122 Nev. 27, 36-37, 126 P.3d 508, 514 (2006). But Lamb's "prior bad acts" objection to Stuart's testimony about Susan's stated fear Lamb would shoot her fails plain error review for at least four reasons. First, Lamb asked for and accepted the district court's ruling that he be allowed to impeach Stuart by im-

plying recent fabrication, suggesting waiver. Second, while Susan's stated fear of Lamb shooting her calls for balancing of probative value against the risk of unfair prejudice under NRS 48.035(1), it does not implicate Lamb in a ''prior bad act'' under NRS 48.045(2), beyond the threat to ''bash her face in'' that Lamb conceded was admissible. *Cf. Salgado v. State*, 114 Nev. 1039, 1042, 968 P.2d 324, 326 (1998) (noting distinction between collateral offenses or prior bad acts and facts directly relevant to the crime charged). Third, Lamb's defense that Cottrell, not he, was the shooter put motive and identity squarely in issue: Lamb's threats against Susan were relevant to motive and, inferentially, Lamb's identity as her killer. *See* David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 8.5.1(a), at 512 (2009) (''When an act has been committed, and the issue is whether a specific person, rather than another, is responsible, evidence that the person in question had a motive to act in that way is relevant because the evidence tends to make it somewhat more likely than it would be without the evidence that that person committed the act.'').[6] Finally, the evidence against Lamb concerning his hatred of and intent to harm his sister was overwhelming.[7]

## D. *Errors in the instructions*

Lamb's claims of instructional error also fail. His request for an instruction on voluntary manslaughter was properly rejected under

---

[6]Lamb cites but is not helped by *Walker v. State*, 116 Nev. 442, 997 P.2d 803 (2000). To be sure, *Walker* involved a murder and prior altercations between the defendant and the deceased. In *Walker*, though, the issue was intent, not motive or identity. The parties' prior confrontations were remote in time and, more importantly, involved heated arguments, not threats of future harm. These acts were not probative of specific intent to kill except when added together with the final deadly confrontation, as proof of propensity for violence and hence, intent to kill, which NRS 48.045(2) and our case law forbid. By contrast, Lamb's threats, which were proven by clear and convincing evidence, went to motive and identity; their probative value on these issues outweighed the risk of unfair prejudice.

[7]As for the multifarious other evidentiary issues Lamb asserts, ''[d]istrict courts are vested with considerable discretion in determining the relevance and admissibility of evidence,'' and a ''decision to admit or exclude evidence will not be reversed on appeal unless it is manifestly wrong.'' *Archanian v. State*, 122 Nev. 1019, 1029, 145 P.3d 1008, 1016 (2006). Applying these standards, we conclude that the district court did not abuse its discretion in its rulings as to the storage facility owner's letter to the Henderson police, the photo lineup witness statements, the State calling Earl Cottrell, and limiting Lamb's efforts to explore the Cottrells' marriage. Lamb's argument that the prosecutor's questions violated his attorney-client privilege, NRS 49.095, is foreclosed by *Franko v. State*, 94 Nev. 610, 614, 584 P.2d 678, 680 (1978). Finally, the State provided Lamb access to the evidence as required by NRS 174.235, and the voluminous writings recovered from Lamb's apartment, car, and storage unit were adequately authenticated under NRS 52.015(1), NRS 52.055, at the preliminary hearing, and, ultimately, by Lamb on the witness stand.

*Williams v. State*, 99 Nev. 530, 531, 665 P.2d 260, 261 (1983), which requires an instruction on a defendant's theory of the case if there is "some evidence, no matter how weak or incredible, to support it." While Lamb had a scrape on his head, nothing linked it to Susan—still less to his theory of the case, which was that Cottrell or someone else killed her, not Lamb. And his objections to Instruction No. 8 (premeditation) and Instruction No. 11 (a transition instruction) fail procedurally because not asserted in the district court, *Morales v. State*, 122 Nev. 966, 971, 143 P.3d 463, 467 (2006), and substantively, under *Byford v. State*, 116 Nev. 215, 238, 994 P.2d 700, 715 (2000), and *Green v. State*, 119 Nev. 542, 549, 80 P.3d 93, 97 (2003), respectively.

E. *Closing arguments*

In closing argument, the defense sought to explore with the jury why the reasonable doubt standard exists. The district court did not abuse its discretion in disallowing this improper "attempt to . . . supplement . . . the statutorily prescribed standard for reasonable doubt." *Evans v. State*, 117 Nev. 609, 631, 28 P.3d 498, 513-14 (2001).

Lamb also challenges the State's closing arguments. But a prosecutor may comment on the defense's failure to call a witness where, as here, the defendant "injected [the person] into the testimony as an alibi witness." *Id.* at 631, 28 P.3d at 513 (alteration in original) (quotation omitted). And while exhorting the jury to "do its job" was arguably improper, *id.* at 633, 28 P.3d at 515 (citation omitted), the district court immediately directed the State to rephrase and it did. Lamb also faults the State's argument during the penalty phase criticizing the weakness of Lamb's evidence of mental illness, *People v. Zambrano*, 163 P.3d 4, 43 (Cal. 2007), *overruled on other grounds by People v. Doolin*, 198 P.3d 11, 36 n.22 (Cal. 2009), but this argument merely "attack[ed] the defense case and argument. Doing so is proper and is, indeed, the essence of advocacy." *People v. Thornton*, 161 P.3d 3, 48 (Cal. 2007) (quotations and citations omitted). Last, rather than appealing to a single juror, the State's comment regarding the occupation of one juror was addressed to the jury as a whole, and was not intended to excite passion. *People v. Hartfield*, 484 N.E.2d 1136, 1142 (Ill. App. Ct. 1985).[8]

---

[8]Lamb's challenge to the sufficiency of the evidence fails because, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Koza v. State*, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984). His contention that he was entitled to be sentenced under the sentencing scheme pre-

### F. *Misconduct involving the jury*

Lamb's final challenge is to the district court's rejection of his motion for a new trial based on the bailiff's improper interaction with the jury. With notice to and no objection from the parties, the trial judge, who had a scheduling conflict, left the jury in another judge's charge on its second day of deliberations. Thereafter, the foreman told the bailiff he had a note for the judge. The bailiff saw the note, which asked about the difference between first- and second-degree murder, but he neither took possession of it nor alerted the parties or either judge. Instead, taking matters into his own hands, the bailiff told the jury the judge was out of the jurisdiction and to read the jury instructions. After this exchange came to light at the penalty hearing, Lamb moved for a new trial. Following an evidentiary hearing, at which the bailiff testified to these facts (no juror affidavits or other testimony was offered), the district court denied the motion for new trial, from which Lamb appeals.

The bailiff's ex parte communication with the jury violated NRS 175.391 and NRS 175.451 and was error. On being told the jury had a note for the judge, the bailiff should not have engaged with the jury further. *See* NRS 175.391 (an officer in charge of a deliberating jury "shall not permit any communication be made to them, or make any personally, unless by order of the court, except to ask them if they have agreed upon their verdict"). Rather, he should have alerted the presiding judge so the parties could be notified and the matter handled according to the protocol laid out in NRS 175.451 or an agreed-upon variation.[9] *See also ABA Principles for Juries and Jury Trials*, Principle 15(D) (2005) ("When jurors submit a question during deliberations, the court, in consultation with the parties, should supply a prompt, complete and responsive answer or should explain to the jurors why it cannot do so.").

A bailiff's ex parte communication with deliberating jurors beyond what NRS 175.391 permits is a species of jury misconduct.

---

scribed for the use of a deadly weapon enhancement, NRS 193.165, in effect at the date of his sentencing, rather than at the date of the crime, is foreclosed by *State v. District Court (Pullin)*, 124 Nev. 564, 569-70, 188 P.3d 1079, 1082-83 (2008). And because the errors that did occur were inconsequential and did not affect the verdict, Lamb's claim of cumulative error fails. *Big Pond v. State*, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985).

[9]NRS 175.451 provides: "After the jury have retired for deliberation, if there is any disagreement between them as to any part of the testimony, or if they desire to be informed on any point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required shall be given in the presence of, or after notice to the district attorney and the defendant or [his or her] counsel."

*See* Wayne R. LaFave et al., *Criminal Procedure* § 24.9(f), at 525 & n.65.2 (3d ed. 2007 & Supp. 2010-11) ("The term 'jury misconduct' [encompasses] conduct by others which contaminates the jury process with extraneous influence," including improper communications with bailiffs). Citing *Conforte v. State*, 77 Nev. 269, 362 P.2d 274 (1961), Lamb asserts prejudice is *presumed* once the bailiff's improper contact is shown. But Lamb overlooks *Meyer v. State*, 119 Nev. 554, 564, 80 P.3d 447, 455 (2003), which, like the federal cases on which it relies, substantially limits the presumed-prejudice rule stated in *Remmer v. United States*, 347 U.S. 227 (1954), and its progeny (including *Conforte*, 77 Nev. at 272, 362 P.2d at 276 (citing *Remmer*, 347 U.S. 227)). *See United States v. Williams-Davis*, 90 F.3d 490, 496-97 (D.C. Cir. 1996) (assessing the impact on *Remmer* of the limits imposed on juror affidavits by FRE 606(b) and concluding that, modernly, *Remmer* illustrates "the importance of *weighing the likelihood* of prejudice rather than as a source of rigid rules"); *Meyer*, 119 Nev. at 564 nn.21 & 22, 565-67, 80 P.3d at 455 nn.21 & 22, 456-57 (citing *Williams-Davis* and NRS 50.065, the Nevada analog to FRE 606(b)).[10] In *Meyer*, this court "reject[ed] the position that any extrinsic influence is automatically prejudicial [and i]nstead [adopted] the position of the [federal] circuit courts that examine the nature of the extrinsic influence in determining whether such influence is presumptively prejudicial." 119 Nev. at 564, 80 P.3d at 455. We explained that only the "most egregious cases of extraneous influence on a juror, such as jury tampering," would warrant a conclusive presumption of prejudice. *Id.*

Under *Meyer*, when made aware of an extrinsic jury communication, the court must first determine the existence and content of the communication. 119 Nev. at 563, 80 P.3d at 455. Then, the court must determine—without relying on direct statements from the jurors about the impact the communication had on their deliberations, *see* NRS 50.065—whether there is a "reasonable probability or likelihood that the [extrinsic communication] affected the verdict." *Id.* at 564, 80 P.3d at 455. In other words: "Did the intrusion affect the jury's deliberations and thereby its verdict?" *United States v. Olano*, 507 U.S. 725, 739 (1993), *quoted in Williams-Davis*, 90 F.3d at 496. In answering this question, the court "must apply an objective test" to determine "whether the average, hypothetical juror would be influenced by the juror misconduct." *Meyer*, 119 Nev. at 566, 80 P.3d at 456. "How much inquiry is necessary . . . depends on how likely was the extraneous

---

[10]We note that, although NRS 50.065 differs from FRE 606(b) in its phrasing, *Meyer* embraces *Tanner v. United States*, 483 U.S. 107, 121 (1987), and does not consider the differences significant. *Meyer*, 119 Nev. at 563 n.20, 80 P.3d at 455 n.20.

communication to contaminate the jury's deliberations." *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005).

Here, neither side disputes that the jury note went to the difference between first- and second-degree murder and that the bailiff told the foreman the judge was unavailable and to read the jury instructions. The extrinsic communication thus is proved. The question is whether the district court abused its discretion when it determined that the exchange was not such as to have had a reasonable probability or likelihood of affecting the jury's deliberations. *Meyer*, 119 Nev. at 561, 80 P.3d at 453 ("A denial of a motion for a new trial based upon juror misconduct will be upheld absent an abuse of discretion by the district court.").

The "official character of the bailiff—as an officer of the court as well as of the State—beyond question carries great weight with a jury." *Parker v. Gladden*, 385 U.S. 363, 365 (1966). Thus, courts give a bailiff's statements to a jury especially close scrutiny in terms of accuracy and potential for coercion when challenged as improper. *See Ward v. Hall*, 592 F.3d 1144, 1181 (11th Cir. 2010); *People v. McLaurin*, 922 N.E.2d 344, 356-57 (Ill. 2009); Diane M. Allen, Annotation, *Communication Between Court Officials or Attendants and Jurors in Criminal Trial as Ground for Mistrial or Reversal—Post-Parker Cases*, 35 A.L.R.4th 890 (1985) (collecting cases).[11] The bailiff's exchange with the jury concerning its note, while improper, nonetheless did not carry a reasonable probability or likelihood of having influenced its verdict.

The jury instructions on first- and second-degree murder were a verbatim reprise of those we approved in *Byford*, 116 Nev. at 236-37 & n.4, 994 P.2d at 714-15 & n.4, and were correct—indeed,

---

[11]Although Lamb does not develop an argument that the bailiff's communication with the jury was tantamount to an improper communication by the court with the jury without him being present, he does cite *Cavanaugh v. State*, 102 Nev. 478, 729 P.2d 481 (1986), and *Varner v. State*, 97 Nev. 486, 634 P.2d 1205 (1981), both ex parte judicial communication, not third-party communication, cases that applied a harmless error analysis rather than the prejudice analysis *Meyer* discusses. Here, there is no indication that the court authorized the bailiff to communicate with the jury as he did, although from the vantage point of the jury foreman, this would not have been clear. The same reasons that lead us to affirm the district court's conclusion of no prejudice also support a determination, under *Cavanaugh* and *Varner*, that the error was harmless on the facts of this case. The suggestion that the jury should consult the instructions was, in sum, "not inappropriate . . . and did not render the verdict invalid." *Farmer v. State*, 95 Nev. 849, 853, 603 P.2d 700, 703 (1979); *cf. Pappas v. State, Dep't Transp.*, 104 Nev. 572, 575, 763 P.2d 348, 350 (1988) (no abuse of discretion in denying motion for new trial in a civil case in which the judge's secretary advised the jury that the judge and lawyers were not available to answer a question and that it should be reduced to writing).

Lamb accepted them without objection or proffered additions. The bailiff's statement that the judge was not available[12] and the jury should read the instructions thus did not introduce incorrect law into the proceedings, *see Scott v. State*, 92 Nev. 552, 555, 554 P.2d 735, 737 (1976) (upholding judge's refusal to reinstruct a deliberating jury on the difference between first- and second-degree murder; if the judge " 'is of the opinion the instructions already given are adequate, correctly state the law and fully advise the jury . . . his refusal to answer a question already answered in the instructions is not error' " (alteration in original) (quoting *Tellis v. State*, 84 Nev. 587, 591, 445 P.2d 938, 941 (1968))), or cost Lamb the ability to cure an identifiable error in the instructions. There was no real contest at trial as to first- or second-degree murder; the issue was identity, not premeditation. On this record, therefore, we uphold the district court's determination that the communication was innocuous and conclude that there was no demonstrated likelihood or probability that the improper ex parte communication between the bailiff and the jury impacted the jury's deliberations. *Compare Wilson v. State*, 511 N.E.2d 1014, 1018 (Ind. 1987) (declining to reverse the district court's order denying motion for new trial based on the bailiff answering a jury question about the verdict forms by telling them to read the instructions because, while the court noted it did not "condone" the ex parte communication "[t]he bailiff's statement to the jury, which directed them to refer to their instructions, was innocuous and not prejudicial"), *and United States ex rel. Clark v. Fike*, 538 F.2d 750, 760-61 (7th Cir. 1976) (rejecting argument that bailiff telling the jury "that if the jury needed information they should look to the instructions" was tantamount to an "Allen charge": "This was the proper response since at that time no questions could be answered. The judge was at dinner. Defense counsel was across town at a policeman's banquet."), *with Moore v. Knight*, 368 F.3d 936, 941 (7th Cir. 2004) (prejudice established where bailiff "clearly conveyed incorrect substantive information").

For these reasons, we affirm Lamb's judgment of conviction of first-degree murder with use of a deadly weapon and his sentence of life imprisonment without the possibility of parole.

DOUGLAS, C.J., and HARDESTY, J., concur.

---

[12]Lamb does not argue, and we do not independently conclude, that the bailiff's statement that the judge was out of the jurisdiction introduced an element of coercion into their deliberations.