In the Matter of the Parental Rights as to J.D.N., Q.E.T., G.M.T., D.A.T., J.L.T., and J.F.T., Minors.

QUIANA M. B.; and ARTHUR L. T., Appellants, *v.* STATE OF NEVADA DEPARTMENT OF FAMILY SERVICES, Respondent.

No. 57746

August 30, 2012                                     283 P.3d 842

*David M. Schieck*, Special Public Defender, and *Melissa Elaine Oliver*, Deputy Special Public Defender, Clark County, for Appellant Quiana M. B.

*Mills & Mills Law Group* and *Gregory S. Mills* and *Daniel W. Anderson*, Las Vegas, for Appellant Arthur L. T.

*Steven B. Wolfson*, District Attorney, and *Ronald L. Cordes* and *Jennifer I. Kuhlman*, Deputy District Attorneys, Clark County, for Respondent.

Before DOUGLAS, GIBBONS and PARRAGUIRRE, JJ.

## OPINION

By the Court, GIBBONS, J.:

In this appeal, we address several issues relating to a termination-of-parental-rights proceeding. First, we determine whether an objection to the admission of the entire juvenile file

("J" file) as hearsay preserved the issue for appeal.[1] Next, we consider the applicable burden of proof imposed upon a parent in order to rebut the parental-fault and child's-best-interest presumptions contained in NRS 128.109. Finally, we decide whether substantial evidence supports the family division of the district court's order terminating appellants Quiana M. B.'s and Arthur L. T.'s parental rights.

We conclude that (1) Arthur waived his hearsay arguments regarding the "J" file by failing to lodge objections at trial to the specific portions of the "J" file he believed contained hearsay; (2) after it is determined that a presumption under NRS 128.109 applies, a parent can rebut that presumption by a preponderance of the evidence; and (3) substantial evidence supports the family division of the district court's order terminating Quiana's and Arthur's parental rights.

## FACTS AND PROCEDURAL HISTORY

Quiana is the biological mother of six minor children. Arthur is the biological father of all of the children except J.D.N.[2]

On May 13, 2007, the Las Vegas Metropolitan Police Department (LVMPD) and a specialist from respondent State of Nevada Department of Family Services (DFS) responded to reports that Quiana had physically disciplined two of her children, G.M.T. and D.A.T., with a belt for soiling themselves. During their investigation, the LVMPD and the DFS specialist discovered marks and bruises on G.M.T. and D.A.T. consistent with the design of a belt. Quiana admitted to whipping the children with a belt when they soiled themselves during potty training. Based on these findings, the LVMPD arrested Quiana for child abuse and the DFS specialist placed all six children in protective custody. After conducting a background check and home visit, DFS placed the children in the care of Quiana's mother. During this time, Arthur was in prison for drug-related charges and was not set to be released until August 2009.

Following DFS's filing of an NRS Chapter 432B child abuse and neglect petition in the juvenile division of the district court, the

---

[1]The term "J" file is used to refer to all of the documents filed with the juvenile division of the district court in an underlying NRS Chapter 432B proceeding, including the case plan and the Department of Family Service's semiannual reports indicating the parents' and children's progress under the case plan.

[2]The family division of the district court also terminated the parental rights of J.D.N.'s putative father in the order being appealed in this matter. However, J.D.N.'s putative father did not file an appeal. Any discussion of Arthur's parental rights is limited to the five remaining minor children.

court found that it would be contrary to the children's welfare to reside with Quiana. Accordingly, the juvenile division of the district court ordered that the children remain in the custody of Quiana's mother under the supervision of DFS. The next day, Quiana pleaded no contest to the child abuse charges brought against her. DFS then filed a case plan for Quiana with the ultimate goal of reunifying Quiana and her children. DFS did not file a case plan for Arthur. From November 2007 to May 2010, DFS filed seven reports with the juvenile division of the district court on a biannual basis updating the court on the family's progress with the case plan.

While Quiana initially demonstrated progress in completing her case plan, DFS's fourth report indicated that Quiana failed to show any further improvement. Quiana failed to provide DFS with proof of employment and failed to demonstrate sufficient housing for her and her children. Quiana also had yet to complete her individual counseling sessions, and her visitation with the children had become inconsistent. Consequently, DFS changed the permanency plan's goal to terminating parental rights, which the juvenile division of the district court approved. In August 2009, DFS petitioned the family division of the district court to terminate Quiana's and Arthur's parental rights.

Prior to the hearing on DFS's petition to terminate parental rights, DFS filed two more reports with the juvenile division of the district court concerning the family's progress. By this time, Arthur had been released from prison. Because Quiana's and Arthur's supervised visitations with their children had been going well, DFS allowed them to have two unsupervised home visits with the children. At the second visit, Arthur choked Quiana on two separate occasions in front of the children. Arthur later pleaded guilty to domestic violence charges and began taking domestic violence classes. Following the incident, DFS recommended that Quiana receive a domestic violence assessment, but Quiana did not begin the domestic violence classes until just before trial due to a scheduling conflict with her visitation days.

On October 7, 2010, the family division of the district court held a hearing on DFS's petition to terminate Quiana's and Arthur's parental rights. DFS called Quiana as its only witness. Quiana testified that she was seeking employment and living with a friend. While Quiana stated that she loved her children, she also expressed no concern over the children being around Arthur following the domestic violence incident and was unsure as to why all the children were in therapy.

Because the children were removed from their home pursuant to NRS Chapter 432B and had resided outside of the home for at least 14 of 20 consecutive months, the family division of the district court applied NRS 128.109(1)(a)'s presumption that Quiana

and Arthur had demonstrated only token efforts to care for the children, and NRS 128.109(2)'s presumption that the best interest of the children would be served by the termination of Quiana's and Arthur's parental rights. The family division of the district court further found that pursuant to NRS 128.109(1)(b), Quiana's and Arthur's failure to substantially comply with the terms and conditions of the reunification plan within six months of the date the case plan commenced was evidence of a failure of parental adjustment. Thus, the family division of the district court allowed Quiana and Arthur to present evidence that would rebut these presumptions. The family division of the district court heard testimony from two DFS specialists, Arthur, and Quiana's counselor. During the termination proceeding, the family division of the district court also admitted the entire juvenile court record ("J" file) into evidence over Arthur's general hearsay objections.

Following the hearing, the family division of the district court granted DFS's petition. The family division of the district court found that neither Quiana nor Arthur rebutted NRS 128.109's presumptions. However, the family division of the district court did not articulate the burden of proof required for Quiana and Arthur to rebut those presumptions. The family division of the district court also did not expressly refer to NRS 128.107, which sets forth certain factors that a court must consider before terminating parental rights when children are not in the physical custody of a parent. The family division of the district court then determined that clear and convincing evidence established that parental fault existed in that Quiana and Arthur demonstrated only token efforts to care for the children, and that they failed to substantially comply with the plan to reunite the family, evidencing a failure of parental adjustment. Specifically, the family division of the district court found that Quiana failed to demonstrate any appreciation as to what had occurred in the children's lives over the past several years and only began to actively participate in counseling as the termination hearing approached. The family division of the district court further determined that Arthur had failed to show any initiative in caring for the children and only had done what his mother had asked him to do with regard to the children. Lastly, the family division of the district court concluded that the termination of Quiana's and Arthur's parental rights was in the children's best interests. In reaching this conclusion, the family division of the district court found that while the parents and children loved each other, neither parent was prepared to take care of all six children and prolonging the termination process would only cause more harm to the children.

Both Quiana and Arthur now appeal this decision. Arthur argues that (1) the family division of the district court improperly admitted the entire "J" file even though it contained hearsay and dou-

ble hearsay statements, (2) the family division of the district court failed to consider the factors contained in NRS 128.106 through NRS 128.108, and (3) substantial evidence does not support the family division of the district court's order terminating his parental rights.[3] Quiana contends that (1) a parent may rebut NRS 128.109's presumptions by a mere preponderance of the evidence; (2) the family division of the district court failed to consider NRS 128.107(4) before terminating her parental rights; and (3) because she rebutted the presumptions by a preponderance of the evidence, substantial evidence does not support the family division of the district court's decision to terminate her parental rights.

## DISCUSSION

### Arthur waived his hearsay arguments regarding the "J" file by failing to state a proper objection

Arthur argues that the family division of the district court abused its discretion by admitting the entire "J" file because the "J" file contains hearsay. DFS responds that the "J" file cannot be excluded as evidence based on a hearsay objection because the "J" file already constitutes part of the family division of the district court record. DFS further asserts that Arthur failed to preserve this issue for appeal because Arthur did not specifically state which portions of the "J" file constitute hearsay.

We review a district court's determination regarding the admissibility of evidence for an abuse of discretion. *Matter of Parental Rights as to N.J.*, 116 Nev. 790, 804, 8 P.3d 126, 135 (2000). When objecting to the admission of evidence, a party must state the specific grounds for the objection. NRS 47.040(1)(a). This specificity requirement applies not only to the grounds for objection, but also to the particular part of the evidence being offered for admission. 1 George E. Dix et al., *McCormick on Evidence* § 52 (Kenneth S. Broun ed., 6th ed. 2006). For example, a party may seek to introduce evidence that consists of several statements, some of which are subject to an objection, others which are not. *Id.* In such a case, it is the responsibility of the party opposing the evidence's admission to object to the specific parts of the evidence that are inadmissible. *Id.* Thus, when a party fails to make a specific objection before the district court, the party fails to preserve the issue for appeal. *Thomas v. Hardwick*, 126 Nev. 142, 156, 231 P.3d 1111, 1120 (2010).

---

[3]During oral argument, DFS requested that this court take judicial notice of facts pertaining to Arthur that occurred after the family division of the district court's order terminating Quiana's and Arthur's parental rights. Given that NRAP 27(a)(1) requires such requests to be made by a written motion, we deny DFS's request.

We conclude that Arthur failed to properly object to the admission of the "J" file. Arthur objected to the entire "J" file on the basis of hearsay, but never specifically stated what portions or documents of the "J" file were inadmissible as hearsay. Without a more specific objection, it is impossible for the family division of the district court to make a proper ruling because it is unclear what evidentiary question is at issue. *See id.* (stating that a proper objection pursuant to NRS 47.040(1) serves to educate both the trial court and the opposing party). By failing to lodge a proper objection to specific portions of the "J" file allegedly containing hearsay, Arthur waived his hearsay arguments pertaining to the "J" file.[4]

Nevertheless, given the seriousness of the rights at issue in a termination-of-parental-rights case, we believe that it is appropriate for us to review this issue for plain error. NRS 47.040(2); *see Lioce v. Cohen*, 124 Nev. 1, 19, 173 P.3d 970, 981-82 (2008) (recognizing that this court may review unobjected-to attorney misconduct for plain error on appeal relating to a motion for new trial); *see also Bradley v. Romeo*, 102 Nev. 103, 105, 716 P.2d 227, 228 (1986) ("The ability of this court to consider relevant issues *sua sponte* in order to prevent plain error is well established."); 5 Am. Jur. 2d *Appellate Review* § 720 (2007) ("Relief under the plain error standard is rarely granted in civil cases and is reserved for those situations where it has been demonstrated that the failure to grant relief will result in a manifest injustice or a miscarriage of justice." (footnotes omitted)).

DFS relies upon our decision in *Matter of Parental Rights as to N.D.O.* to assert that the "J" file cannot be excluded as evidence based on a hearsay objection because the "J" file already constitutes part of the family division of the district court record. *See* 121 Nev. 379, 115 P.3d 223 (2005). We disagree. *Matter of Parental Rights as to N.D.O.* related to whether due process mandates the appointment of counsel for a parent during a termination-of-parental-rights proceeding. 121 Nev. at 382-83, 115 P.3d at 225. In reaching its conclusion, this court evaluated the risk of an erroneous decision if the appellant had not received counsel during the termination proceeding. *Id.* at 384-86, 115 P.3d at 226-27. While the appellant pointed out that her attorney had not ob-

---

[4]Arthur further argues that the family division of the district court abused its discretion in admitting the "J" file because DFS failed to authenticate the "J" file. However, Arthur also waived this argument because he did not raise it before the family division of the district court. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) ("A point not urged in the trial court, unless it goes to the jurisdiction of that court, is deemed to have been waived and will not be considered on appeal.").

jected to hearsay statements included in testimony by DFS workers, this court determined that these statements were already part of the record because they appeared in DFS's reports that it submitted to the juvenile division of the district court. *Id.* at 384-85, 115 P.3d at 226-27. However, this conclusion does not mean that the "J" file always forms part of the family division of the district court record in a termination proceeding. Instead, the "J" file is part of DFS's file. DFS submits the various documents and semi-annual reports that make up the "J" file with the juvenile division of the district court as part of an NRS Chapter 432B proceeding. Thus, DFS submits the documents of the "J" file to a separate court in a separate proceeding. As a result, the entire "J" file does not already form part of the family division of the district court record during a termination-of-parental-rights proceeding.

Because the entire "J" file does not automatically form part of the family division of the district court record, the "J" file is only admissible if it complies with Nevada's statutes and rules of evidence, including the hearsay rule and any hearsay exception. In light of this requirement, we note that the family division of the district court may admit the entire "J" file subject to specific objections lodged by either party. Here, the family division of the district court admitted the entire "J" file into evidence without considering any further, specific objections. NRS 128.090(3) also provides that "[i]nformation contained in a report filed pursuant to NRS 432.0999 to 432.130, inclusive, or chapter 432B of NRS may not be excluded from the proceeding by the invoking of any privilege." Thus, NRS 128.090(3) expressly allows the family division of the district court to admit reports from an NRS Chapter 432B proceeding contained in a "J" file without complying with Nevada's privilege requirements. However, NRS 128.090(3) does not extend this exception beyond privileges, and the "J" file still must comply with the rest of Nevada's statutes and rules on evidence, including the hearsay rule.

During Quiana's and Arthur's termination proceeding, the family division of the district court admitted the "J" file in its entirety. Despite this admission of the entire "J" file, we conclude, as discussed below, substantial evidence beyond the inadmissible portions of the "J" file, if any, supports the family division of the district court's finding that parental fault exists and that the termination of Quiana's and Arthur's parental rights would serve the children's best interests. *McMonigle v. McMonigle*, 110 Nev. 1407, 1409, 887 P.2d 742, 744 (1994) (presuming district court disregarded improper evidence when there is other substantial evidence upon which the court based its findings). Thus, the family division

of the district court's admission of the entire "J" file did not result in a manifest injustice that would constitute plain error.

*The applicable burden of proof to rebut NRS 128.109's presumptions is a preponderance of the evidence*

A party petitioning to terminate parental rights must establish by clear and convincing evidence that termination is in the children's best interests and that parental fault exists. *In re Parental Rights as to N.J.*, 125 Nev. 835, 843, 221 P.3d 1255, 1261 (2009); NRS 128.090(2); *see* NRS 128.105. On appeal, we review purely legal questions de novo. *Rennels v. Rennels*, 127 Nev. 564, 569, 257 P.3d 396, 399 (2011). Determining the appropriate burden of proof to rebut NRS 128.109's presumptions is a question of law subject to de novo review.

Quiana argues that she rebutted NRS 128.109's presumptions by a preponderance of the evidence. Quiana points out that NRS 128.090(2) only raises the burden of proof for petitioners in cases involving the termination of parental rights, and otherwise, states that termination proceedings are civil in nature. Therefore, Quiana contends that NRS 47.180 applies and only requires a party to a civil case to rebut a presumption by a preponderance of the evidence. However, DFS interprets NRS 128.090(2) as requiring both the petitioner and the parents in a termination proceeding to satisfy a clear and convincing burden of proof.

The family division of the district court did not articulate the burden of proof it relied upon when determining that Quiana and Arthur failed to rebut NRS 128.109's presumptions. We conclude that the proper burden of proof required for a parent to rebut NRS 128.109's presumptions is a preponderance of the evidence, and that Quiana and Arthur failed to meet this burden.

NRS 128.109 sets forth presumptions that the family division of the district court must apply in certain termination proceedings. However, the statute is silent with regard to the burden of proof necessary to rebut these presumptions. While NRS 128.109 does not address the appropriate burden of proof for rebuttal, NRS 128.090(2) explains that termination-of-parental-rights cases are civil in nature. We have previously stated that in civil matters, presumptions can be rebutted by a preponderance of the evidence. NRS 47.180(1);[5] *see Construction Indus. v. Chalue*, 119 Nev. 348, 353, 74 P.3d 595, 598 (2003) (requiring a workers' compensation claimant to rebut the presumption that a controlled sub-

---

[5]NRS 47.180(1) states, "A presumption, other than a presumption against the accused in a criminal action, imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

stance caused his work-related injuries by a preponderance of the evidence).

While DFS admits that NRS 47.180 applies to civil cases in general, DFS asserts that NRS 128.090(2) creates an exception to NRS 47.180 by raising the burden of proof in termination proceedings to clear and convincing evidence for both the petitioner and a parent. Specifically, DFS relies upon NRS 128.090(2)'s language that a court "shall in all cases require the petitioner to establish the facts by clear and convincing evidence and shall give full and careful consideration to all of the evidence presented, with regard to the rights and claims of the parent of the child." We agree that NRS 128.090 clearly requires the petitioner, the party moving to terminate parental rights, to satisfy a clear and convincing burden of proof. *See In re Parental Rights as to C.C.A.*, 128 Nev. 166, 169, 273 P.3d 852, 854 (2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982)). However, we disagree with DFS that NRS 128.090's language also raises the burden of proof for a parent attempting to rebut a presumption set forth in NRS 128.109. Because NRS 128.109 is silent on the appropriate burden of proof for rebutting its presumptions and a termination proceeding is civil in nature, we conclude that NRS 48.170 applies, and thus, the burden of proof for a parent attempting to rebut an NRS 128.109 presumption is a preponderance of the evidence.

This conclusion is also consistent with the constitutional concerns that are implicated during termination proceedings. *See Matter of Parental Rights as to D.R.H.*, 120 Nev. 422, 426-27, 92 P.3d 1230, 1233 (2004) (stating that parental termination proceedings involve a parent's fundamental right to raise his or her child). While we recognize that NRS 128.109's presumptions promote DFS's compelling interest of providing a safe and stable environment for abused and neglected children, we also recognize that the parent-child relationship is a fundamental liberty interest. *See id.* Due to this fundamental liberty interest, a party seeking to terminate parental rights must prove its petition by clear and convincing evidence. *See In re Parental Rights as to C.C.A.*, 128 Nev. at 169, 273 P.3d at 854. The United States Supreme Court has explained that this higher burden of proof is necessary in order to adequately convey to a fact-finder that the risk of erroneously terminating parental rights must be lower than the risk of erroneously failing to terminate them. *Santosky*, 455 U.S. at 765-66. If we were to adopt DFS's theory that a parent must rebut NRS 128.109's presumptions by clear and convincing evidence, the risk to a petitioner and parent in a termination proceeding would be equally allotted. *See In re Interest of Kyle S.-G.*, 533 N.W.2d 794, 797-99 (Wis. 1995) (rejecting argument that a parent must rebut a

presumption in a termination proceeding by clear and convincing evidence as being contrary to the allocation of risk between a parent and a petitioner seeking to terminate parental rights). Therefore, we cannot agree with DFS that a parent must rebut NRS 128.109's presumptions by clear and convincing evidence.

Other states addressing this issue have reached a similar conclusion. *See, e.g.*, *Interest of L.D.B.*, 891 P.2d 468, 471 (Kan. Ct. App. 1995) (holding that a parent must rebut a presumption of parental unfitness during a termination proceeding by a preponderance of the evidence); *In re Interest of Kyle S.-G.*, 533 N.W.2d at 797 (concluding that a parent must rebut a presumption of abandonment by a preponderance of evidence during a termination proceeding); *cf. In re A.M.*, 831 N.E.2d 648, 653-55 (Ill. App. Ct. 2005) (determining a parent must rebut a presumption in a termination proceeding by introducing sufficient evidence to the contrary of the presumption); *In re Welfare of J.W.*, 807 N.W.2d 441, 445-46 (Minn. Ct. App. 2011) (requiring a parent to rebut a presumption in a termination proceeding by presenting evidence " 'that would justify a finding of fact contrary to the assumed fact' " (quoting Minn. R. Evid. 301)). Based on our review of the pertinent statutes, we conclude that Nevada law requires a parent to rebut NRS 128.109's presumptions by a preponderance of the evidence.[6]

*The family division of the district court considered the appropriate factors and its order terminating Quiana's and Arthur's parental rights is supported by substantial evidence*

Having determined the appropriate burdens of proof, we now turn to Quiana's and Arthur's arguments regarding whether the family division of the district court properly considered the relevant factors in determining if their parental rights should be terminated and whether substantial evidence supports the order terminating their parental rights. When reviewing a family division of the district court's order terminating parental rights, we closely scrutinize the order to determine if substantial evidence supports the district court's factual findings. *Matter of Parental Rights as to A.J.G.*,

---

[6]We also note that this conclusion is distinguishable from our general statement in *Rivera v. Philip Morris, Inc.*, that the burden of persuasion remains with one party throughout a case. 125 Nev. 185, 191, 209 P.3d 271, 275 (2009). *Rivera* involved the applicability of a heeding presumption in a strict product liability failure-to-warn case. *Id.* at 187, 209 P.3d at 272. In this case, we are discussing specific statutes, NRS 128.090 and NRS 128.109, relating to the unique context of proceedings to terminate parental rights. Therefore, our conclusion here applies in cases involving the termination of parental rights and does not affect our decisions in other contexts involving the rebuttal of a presumption.

122 Nev. 1418, 1423, 148 P.3d 759, 763 (2006). However, we will not substitute our own judgment for that of the district court. *Id.*

### *The family division of the district court properly considered NRS 128.107*

Where a child is not in the parent's physical custody in a parental rights termination case, NRS 128.107 contains specific factors that the family division of the district court must consider before terminating parental rights. When the petitioner has demonstrated that NRS 128.109's presumptions apply, the burden to present evidence regarding NRS 128.107's factors lies with the parent. *See Matter of Parental Rights as to A.J.G.*, 122 Nev. at 1426, 148 P.3d at 765.

After the family division of the district court determined that NRS 128.109's presumptions applied, Quiana and Arthur bore the burden of presenting evidence relating to NRS 128.107's factors that would help rebut those presumptions. The family division of the district court did not expressly refer to NRS 128.107 in its order terminating Quiana's and Arthur's parental rights. As the consideration of NRS 128.107's factors is mandatory, it must be clear from the termination order that the family division of the district court applied NRS 128.107's factors. Here, the family division of the district court did not explicitly refer to NRS 128.107, but the order demonstrates that the court applied the required NRS 128.107 factors when finding that Quiana and Arthur failed to rebut NRS 128.109's presumptions. At the termination proceeding, the family division of the district court heard evidence regarding the services that DFS had provided to Quiana and Arthur, the children's needs, the efforts that Quiana and Arthur had made to reunite with the children, and whether additional services would bring about any change in Quiana and Arthur. *See* NRS 128.107. In light of this evidence, the family division of the district court found that Quiana and Arthur had not made sufficient efforts to reunite with their children. The family division of the district court also was not convinced that either Quiana or Arthur were capable of raising all six children, even with the help of continued services. Thus, the family division of the district court properly considered NRS 128.107's factors when determining that Quiana and Arthur failed to rebut NRS 128.109's presumptions.[7]

---

[7]Arthur further argues that the family division of the district court erred by failing to consider the factors contained in NRS 128.106 and NRS 128.108. We disagree. NRS 128.106 does not apply because the family division of the district court did not make a finding of parental fault based on neglect or unfitness. *See* NRS 128.106 (requiring a district court to consider certain factors

*Substantial evidence supports the family division of the district court's finding that parental fault existed based on token efforts*

Based on the time that the children had resided outside of the home, the family division of the district court also applied NRS 128.109(1)(a)'s presumption of parental fault based on token efforts. Parental fault exists if a parent engages in only token efforts to care for a child. NRS 128.105(2)(f). A petitioner must demonstrate that a parent has only made token efforts "(1) [t]o support or communicate with the child; (2) [t]o prevent neglect of the child; (3) [t]o avoid being an unfit parent; or (4) [t]o eliminate the risk of serious physical, mental or emotional injury to the child." *Id.*

The family division of the district court found that the evidence presented by Quiana and Arthur was insufficient to overcome the presumption of parental fault based on token efforts. At the conclusion of the trial, the family division of the district court expressed its uncertainty as to whether Quiana had addressed the issues that had caused her to whip her two children in the first place. In the order terminating Quiana's parental rights, the family division of the district court further stated that Quiana made only token efforts to care for her children, which were too little too late, as she did not meaningfully participate in any of the bonding or counseling sessions until 2010. Indeed, the appellate record shows that DFS removed the children from Quiana's care in May 2007 and Quiana was required to attend parenting classes and anger management classes. While Quiana initially complied with these case plan objectives, Quiana never completed all of the required individual anger management sessions. In September 2009, Quiana reinitiated attempts to complete her required counseling by attending a parent-bonding group and individual therapy. However, Quiana was uncooperative and resistant during these sessions. According to the testimony of Quiana's counselor, Quiana only began to actively participate in January 2010, shortly before trial.

The family division of the district court further found that Arthur had made only token efforts to care for his children that were, likewise, too little too late. The family division of the district court recognized that Arthur had made some efforts to support the children, but also determined that Arthur failed to take any initia-

---

before making a finding of parental fault based on neglect or unfitness). NRS 128.108 also does not apply because DFS did not petition to terminate the parental rights of Quiana and Arthur with the ultimate goal of having the foster parents adopt the children. *See* NRS 128.108 (requiring a district court to consider certain factors when a child resides in a foster home and the ultimate goal of the termination process is to have the foster parents adopt the child).

tive in raising the children and deferred to his mother regarding the care of the children. The appellate record supports these findings as well. During Arthur's testimony, Arthur explained how one of his children had lived with him and his mother following his release from prison. Arthur stated that when his mother asked him to help care for the child, he did so. Arthur also explained that if his mother was to receive custody of all the children, he would do anything that she asked him to do in order to help care for the children. Thus, most of Arthur's statements regarding the care of his children related back to his mother. Furthermore, Arthur failed to actively participate in his domestic violence classes following the choking incident with Quiana. While Arthur attended the domestic violence classes, he received poor evaluations regarding his participation in these classes. Therefore, we conclude that Quiana and Arthur failed to rebut the presumption of token efforts and that substantial evidence supports the family division of the district court's finding that parental fault existed.

*Substantial evidence supports the family division of the district court's finding that termination of parental rights was in the children's best interests*

In determining whether the termination of parental rights is in a child's best interest, the Legislature has recognized that a child's continuing need for proper physical, mental, and emotional growth and development are relevant considerations. *Matter of Parental Rights as to D.R.H.*, 120 Nev. at 433, 92 P.3d at 1237 (quoting NRS 128.005(2)(c)).

Due to the time period that the children had been removed from the home, the family division of the district court applied NRS 128.109(2)'s presumption that termination would serve the children's best interests. At the conclusion of the trial, the family division of the district court determined that neither parent had rebutted the presumption that termination would be in the best interests of the children. The family division of the district court found that neither Quiana nor Arthur was prepared to receive custody of all six children. The family division of the district court stated that DFS was raising the children instead of the parents. While the family division of the district court believed that Quiana and Arthur eventually would be able to apply the lessons they were learning from services, the court also found that the longer the process was delayed, the more harmful it would be to the children.

The appellate record supports these findings. By the time of the termination proceeding, the children had been living outside of the home for more than three years. Since the children's removal from

the home, Quiana's testimony indicated that she had been unable to secure stable housing or employment for more than a short period of time. Although Quiana's counselor testified that Quiana and the children were very bonded and that termination would not be in the children's best interests, the counselor also admitted that it would be very difficult for Quiana to receive custody of all six children at once. Instead, the counselor suggested that Quiana should receive custody of the children one at a time over a year with the help of continued services. Ultimately, the family division of the district court did not give much weight to the testimony of Quiana's counselor. As the family division of the district court is in a better position to weigh the credibility of witnesses, we will not substitute our judgment for that of the district court. *See Matter of Parental Rights as to C.J.M.*, 118 Nev. 724, 732, 58 P.3d 188, 194 (2002) (recognizing that a district court is in the best position to observe the demeanor of parties and assess their credibility).

The family division of the district court also found that Quiana's testimony was so evasive and her recollection so faulty that she failed to demonstrate any appreciation for what had gone on with her children since their removal from her home back in 2007. During her testimony, Quiana expressed uncertainty as to why her children were in need of therapy. Quiana testified that she had no concerns about Arthur being around the children, even though Arthur had recently committed domestic violence against Quiana in front of the children. Quiana also stated that she was unsure as to how much more time she would need before she would be able to care for the children on her own. Given this testimony and the fact that the family division of the district court is in a better position to observe the parties, we again will not substitute the court's judgment with our own.

The record also supports the family division of the district court's finding that Arthur was not prepared to receive custody of his children. During trial, Arthur testified regarding the time that one of his children had lived with him and his mother. However, Arthur stated that as soon as his mother was unable to care for the child, DFS removed the child from the home. Furthermore, when DFS granted Arthur an unsupervised visit with Quiana and the children, Arthur committed domestic violence against Quiana twice in front of the children. Therefore, substantial evidence supports the family division of the district court's finding that the termination of Quiana's and Arthur's parental rights would serve the children's best interests.[8]

---

[8]Quiana and Arthur also contend that substantial evidence does not support the family division of the district court's finding of parental fault based on a failure of parental adjustment. However, because we determine that substantial

In light of the foregoing, we affirm the family division of the district court's order terminating Quiana's and Arthur's parental rights.

Douglas and Parraguirre, JJ., concur.

---

evidence supports the family division of the district court's finding of token efforts, we need not consider further whether substantial evidence supports the court's finding that Quiana and Arthur failed to make parental adjustments. *See* NRS 128.105 (stating that in order to terminate parental rights, a district court must find that termination is in the child's best interest and that at least one parental fault factor exists).