133 Nev., Advance Opinion 72

IN THE SUPREME COURT OF THE STATE OF NEVADA

IN THE MATTER OF THE PARENTAL RIGHTS AS TO A.D.L. AND C.L.B., JR., MINORS.

KEAUNDRA D.; A.D.L.; AND C.L.B., JR.,
Appellants,
vs.
CLARK COUNTY DEPARTMENT OF FAMILY SERVICES,
Respondent.

No. 69047



FILED

OCT 05 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order terminating a mother's parental rights as to her minor children. Eighth Judicial District Court, Family Court Division, Clark County; Robert Teuton, Judge.

*Reversed.*

Legal Aid Center of Southern Nevada, Inc., and Christal L. Dixon, Las Vegas,
for Appellants A.D.L. and C.L.B., Jr.

David M. Schieck, Special Public Defender, and Deanna M. Molinar and Melinda E. Simpkins, Deputy Special Public Defenders, Clark County,
for Appellant Keaundra D.

Steven B. Wolfson, District Attorney, and Ronald L. Cordes, Chief Deputy District Attorney, Clark County,
for Respondent.

BEFORE HARDESTY, PARRAGUIRRE and STIGLICH, JJ.

*OPINION*

By the Court, HARDESTY, J.:

In this opinion, we consider whether a parent's Fifth Amendment rights are violated when he or she is required to admit to a criminal act in order to maintain his or her parental rights. We conclude that a parent cannot be compelled to admit to a crime under the threat of termination of parental rights.

Appellant Keaundra D. was required to admit to a criminal act for her to be considered in compliance with her case plan, which we conclude was a violation of her Fifth Amendment rights. Additionally, we conclude that Keaundra overcame the presumptions in NRS 128.109(1)-(2) that terminating parental rights was in the best interests of the children. In the absence of such presumptions, there was not substantial evidence supporting the district court's termination of Keaundra's parental rights. Accordingly, we reverse.

## FACTS AND PROCEDURAL HISTORY[1]

In April 2010, respondent Clark County Department of Family Services (DFS) received an anonymous call through its child abuse hotline alleging that Keaundra's children were being abused and neglected. The caller alleged that the face of Keaundra's infant child had been burned. During an interview with a DFS investigator, Keaundra stated that she

---

[1]This matter previously came before us on appeal challenging a separate district court order terminating Keaundra's parental rights, and we entered an opinion of reversal and remand. *See In re Parental Rights as to A.L. and C.B.*, 130 Nev., Adv. Op. 91, 337 P.3d 758 (2014). The facts and procedural history here are largely taken from that opinion.

 

was the only adult at home when C.L.B., Jr. was burned. Her two children, A.D.L. and C.L.B., Jr., were in the master bedroom while she was preparing for work in the attached bathroom. She had recently ironed her clothes and had placed the iron on her dresser. Keaundra heard the iron fall and when she came out to investigate, A.D.L. told her that C.L.B., Jr. had "tried to kiss the iron." Keaundra then called her mother, a nurse, who told her to put ointment on the injury and to take C.L.B., Jr. to the emergency room if the burn blistered.

Following the initial contact with DFS, Keaundra moved her family to Louisiana, where her father was stationed with the U.S. Air Force. Upon learning that Keaundra moved to Louisiana, DFS sought help from U.S. Air Force authorities to gain protective custody of the children. The children were removed from Keaundra's care, and C.L.B., Jr. was taken to see Dr. Thomas A. Neuman, a physician in Louisiana. Dr. Neuman reported that the injury was well healed and that there was no evidence of abuse.

In May 2010, DFS filed a petition for protective custody of A.L.D. and C.L.B., Jr. under NRS Chapter 432B, alleging that Keaundra had either physically abused or negligently supervised C.L.B., Jr. A plea hearing was held wherein Keaundra entered a denial, and DFS requested placement of the children with their maternal grandmother.

At a subsequent adjudicatory hearing, the hearing master took testimony from Dr. Neha Mehta, a medical examiner who had reviewed photographs of C.L.B., Jr.'s injuries. Dr. Mehta opined that the shape of the injury was not consistent with an accident and that the iron had been deliberately held to C.L.B., Jr.'s face. Keaundra offered Dr. Neuman's report to rebut Dr. Mehta's testimony. The hearing master

excluded the report on the ground that the report was not a certified copy. The hearing master found that Keaundra had physically abused C.L.B., Jr., had medically neglected him, and had absconded. Based on those findings, the hearing master recommended sustaining the abuse and neglect petition and that A.D.L. and C.L.B., Jr. remain in DFS custody. The juvenile court affirmed the hearing master's recommendation and concluded that C.L.B., Jr.'s injury was nonaccidental.

In light of these findings, Keaundra received a case plan which required that she maintain stable housing and income, keep in contact with DFS, and complete parenting classes. She was also required to complete a physical abuse assessment and "be able to articulate in dialogue with the Specialist and therapist(s) the sequence of events which result[ed] in physical abuse, as sustained by the Court, and how he/she will be able to ensure that no future physical abuse to [C.L.B.,] Jr. occurs." One month after giving Keaundra the case plan, DFS recommended termination of parental rights as the goal for the children. DFS then filed a petition to terminate Keaundra's parental rights as to A.D.L. and C.L.B., Jr.

At her six-month review, DFS reported that Keaundra had completed her parenting classes, maintained housing, held regular jobs, and completed both her assessment and therapy. At that point, the children had been placed with their maternal grandmother in Louisiana, where Keaundra was also living. DFS stated that it was satisfied with Keaundra's progress. DFS further stated that Keaundra had "successfully completed her case plan and has the knowledge and tools to effectively parent her children." Despite DFS's satisfaction with Keaundra's progress, it nonetheless maintained its recommendation that her parental

rights be terminated because she had not admitted that she abused C.L.B., Jr. by holding an iron to his face. DFS later stated at trial that, with such an admission, it would not have sought termination of parental rights.

At the next six-month review, DFS again noted that Keaundra had completed her case plan in all other regards and that she acknowledged that negligence and improper supervision caused C.L.B., Jr.'s injury. Again, DFS maintained its recommendation to terminate parental rights due to Keaundra's refusal to admit that she held the iron to C.L.B., Jr.'s face.

In the meantime, Keaundra moved to South Carolina and was referred to a new therapist, who was in regular contact with a DFS caseworker. At the parental termination trial, the new therapist testified that therapy resulted in a marked change in Keaundra's behavior and demeanor. She noted that despite signs of depression and anxiety at the start of therapy, Keaundra's demeanor had substantially changed over the course of treatment and her risk to reoffend was low. The therapist saw no signs that she would expect to see in an abusive parent.

At the conclusion of the trial, the district court issued a decision terminating Keaundra's parental rights as to C.L.B., Jr. and A.D.L. The district court relied on the hearing master's findings, as affirmed by the juvenile court, that Keaundra was at fault for C.L.B., Jr.'s injuries and that his injuries were not accidental. Because Keaundra was unable to remedy the "circumstances, conduct or conditions" leading to C.L.B., Jr.'s removal, the district court terminated her parental rights based on token efforts, failure of parental adjustment, and unfitness. The

district court further found that termination was in the best interests of the children.

Keaundra appealed that decision to this court. We reversed the district court's order based on the failure to admit the report of Dr. Neuman and remanded the matter for a new trial on the issue of parental fault and consideration of additional evidence.

As a result of this court's decision, Keaundra filed a motion to immediately reinstate her visitation with A.D.L. and C.L.B, Jr., to have a Children's Attorneys Project attorney appointed for the children, and to change her permanency plan to reunification. The district court initially denied Keaundra's motion for visitation but later ordered visitation at the discretion of the children's therapist.

Before the second trial, the parties stipulated to admission of all evidence from the prior termination trial, retaining only the issue of the inappropriate finding of parental fault based on the exclusion of Dr. Neuman's report. At the new parental termination trial, the district court admitted Dr. Neuman's report over the objection of DFS, and Dr. Mehta again testified over the objection of Keaundra's counsel. Dr. Mehta once again opined that the injury to C.L.B., Jr.'s face was inconsistent with the explanation given, but she admitted that this opinion was based only on viewing the photographs before the initial trial. Dr. Mehta testified that generally her practice in ascertaining the nature of an injury would be to obtain as much information as possible. Dr. Mehta only recalled being told of an iron and a child kissing the iron; she did not interview any witnesses to the incident, did not see the child in person, and was unaware of the previous report from Dr. Neuman stating that there was no sign of

abuse. Dr. Mehta noted that although an accidental cause of injury was possible, she could not conceive of such an explanation.

After closing arguments, the district court inquired as to whether any offer of immunity had been given to Keaundra, as well as why that immunity was not offered in order to further reunification efforts. The district court further opined that because the court's purpose in protective custody proceedings is to reunify children, parents need to be open and honest, and, as such, the judge's practice is to offer immunity from statements made to treatment providers or DFS. DFS acknowledged that Keaundra was not offered immunity. DFS further indicated that it was unaware of any legal authority that would preclude the offer of immunity. While acknowledging that the offer of immunity would cure any Fifth Amendment concerns, DFS indicated that immunity did not apply in Keaundra's case.

The district court ultimately reaffirmed its prior decision to terminate Keaundra's parental rights, due largely to Dr. Mehta's credentials and compelling testimony. The district court ended its decision by noting that Keaundra "continued to insist that the burn was accidental in nature in spite of all physical evidence being to the contrary." Keaundra now appeals.

*DISCUSSION*

On appeal, Keaundra argues that terminating her parental rights on the sole basis that she refused to admit that she intentionally harmed C.L.B., Jr. violated her Fifth Amendment right against self-incrimination. Keaundra further argues that the district court's decision to terminate her parental rights was erroneous as it was not supported by substantial evidence.

*The district court's termination of Keaundra's parental rights constituted a violation of her Fifth Amendment right against self-incrimination*

Keaundra contends that the district court abused its discretion by finding that she did not exhibit behavioral changes that would warrant the return of her children since that finding was based solely on her noncompliance with her case plan because she refused to admit that she abused C.L.B., Jr. Thus, she argues, reunification and the avoidance of the termination of her parental rights were conditioned on her admitting a criminal act, in violation of her Fifth Amendment right against self-incrimination. We agree.

The Fifth Amendment right against self incrimination, which applies to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." *See Estelle v. Smith*, 451 U.S. 454, 462 (1981) (quoting U.S. Const. amend. V). The Fifth Amendment not only protects individuals in criminal proceedings, "but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). Further, an individual cannot be penalized for invoking his Fifth Amendment right. *Spevack v. Klein*, 385 U.S. 511, 514-15 (1967).

The United States Supreme Court has held that the state may not compel a person to choose between the Fifth Amendment privilege against self-incrimination and another important interest because such a choice is inherently coercive. *Lefkowitz v. Cunningham*, 431 U.S. 801, 805-08 (1977). This court has recognized that "the parent-child relationship is a fundamental liberty interest." *In re Termination of Parental Rights as to N.J.*, 116 Nev. 790, 801, 8 P.3d 126, 133 (2000).

SUPREME COURT
OF
NEVADA

(O) 1947A

Thus, we agree with other courts that have held that a parent may not be compelled to admit a crime under the threat of the loss of parental rights. *See, e.g., In re A.W.*, 896 N.E.2d 316, 326 (Ill. 2008) ("We agree with those courts that have held a juvenile court may not compel a parent to admit to a crime that could be used against him or her in a subsequent criminal proceeding by threatening the loss of parental rights."); *In re Amanda W.*, 705 N.E.2d 724, 727 (Ohio Ct. App. 1997) (finding that a "penalty for failure to satisfy the requirements of a particular case plan is the loss of a parent's fundamental liberty right to the care, custody, and management of his or her child," as "this is the type of compelling sanction that forces an individual to admit to offenses in violation of his right not to incriminate himself"); *Dep't of Human Servs. v. K.L.R.*, 230 P.3d 49, 54 (Or. Ct. App. 2010) ("[R]equiring an admission of abuse as a condition of family reunification violates a parent's Fifth Amendment rights . . . ."); *In re M.C.P.*, 571 A.2d 627, 641 (Vt. 1989) ("The trial court cannot specifically require the parents to admit criminal misconduct in order to reunite the family.").

The state, on the other hand, has an important interest in protecting the welfare of children. *See In re N.J.*, 116 Nev. at 802, 8 P.3d at 133; *see also* NRS 128.005(2)(c) ("The continuing needs of a child for proper physical, mental and emotional growth and development are the decisive considerations in proceedings for termination of parental rights."). When a child has been removed from a parent's custody because of abuse, the court must consider whether the parent has adjusted the circumstances for the child's safe return. *See generally* NRS 128.107(3); *In re M.C.P.*, 571 A.2d at 640 ("It would be irresponsible for the court to

return an abused child to the custody of abusive parents unless and until it can be assured that there will be no repetition of the abusive actions.").

In balancing a parent's Fifth Amendment right against self-incrimination and the need for meaningful rehabilitation in cases where a child has been removed from the parent's custody because of alleged child abuse, courts have generally concluded that while a court can require a parent to complete therapy as part of a family reunification plan, courts cannot explicitly compel a parent to admit guilt, either through requiring a therapy program that specifically mandates an admission of guilt for family reunification, or otherwise through a direct admission, because that violates the parent's Fifth Amendment right. *In re A.W.*, 896 N.E.2d at 326 ("[A] trial court may order a service plan that requires a parent to engage in effective counseling or therapy, but may not compel counseling or therapy requiring the parent to admit to committing a crime."); *In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002); ("The State may require parents to otherwise undergo treatment, but it may not specifically require an admission of guilt as part of the treatment."); *In re J.W.*, 415 N.W.2d 879, 883 (Minn. 1987) ("While the state may not compel therapy treatment that would require appellants to incriminate themselves, it may require the parents to otherwise undergo treatment."); *see also Minh T. v. Ariz. Dep't of Econ. Sec.*, 41 P.3d 614, 617-18 (Ariz. Ct. App. 2001) ("[T]he State may require therapy and counseling for the parents. . . . However, there is a distinction between a treatment order that requires parents to admit criminal misconduct and one that merely orders participation in family reunification services.").

Accordingly, there is a distinction between a court-ordered case plan that mandates admission of culpability for family reunification

and one that requires meaningful therapy for family reunification. Invoking the Fifth Amendment may have consequences and "[o]ne such consequence may be a person's failure to obtain treatment for his or her problems," and a failure to participate in meaningful therapy may result in the termination of parental rights without a violation of the Fifth Amendment, so long as the court did not mandate an admission of guilt. *In re C.H.*, 652 N.W.2d at 150; *In re P.M.C.*, 902 N.E.2d 197, 203 (Ill. App. Ct. 2009) (observing that where a parent fails to comply with an order to complete meaningful therapy because the refusal to admit guilt inhibits rehabilitation, there is no constitutional violation); *K.L.R.*, 230 P.3d at 54 (concluding that "terminating or limiting parental rights based on a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation, perhaps in part because a parent's failure to acknowledge past wrongdoing inhibits meaningful therapy, may not violate the Fifth Amendment").

We need not resolve the tension created by a parent's exercise of his or her Fifth Amendment right and its importance to meaningful therapy or rehabilitation. Notably, in Keaundra's case, DFS's six-month report confirmed that Keaundra's therapy was indeed effective without the need for an admission of guilt.

This approach is consistent with existing Nevada caselaw regarding the invocation of the Fifth Amendment in civil proceedings. *See Francis v. Wynn Las Vegas, LLC*, 127 Nev. 657, 664, 262 P.3d 705, 711 (2011) ("The Fifth Amendment privilege against self-incrimination may be invoked in both criminal and civil proceedings."). Because Keaundra's case plan required her to admit that she intentionally caused C.L.B., Jr.'s injury, she could not fully comply with the case plan without admitting

that she committed a criminal act. *See* NRS 200.508 (defining and providing penalties for abuse, neglect, and endangerment of a child). And, in terminating Keaundra's parental rights, the court based its decision on its finding that Keaundra "continued to insist that the burn was accidental in nature." Accordingly, we conclude that the district court violated Keaundra's Fifth Amendment rights by terminating her parental rights based on her refusal to admit that she intentionally caused C.L.B., Jr.'s injury.[2] *See In re J.W.*, 415 N.W.2d at 882-83 (holding that conditioning termination on compliance with a court-ordered case plan that requires admission to criminal conduct is a threat that triggers the Fifth Amendment).

*There was not substantial evidence to support the district court's decision to terminate Keaundra's parental rights*

"A party petitioning to terminate parental rights must establish by clear and convincing evidence that (1) termination is in the child's best interest, and (2) parental fault exits." *In re Parental Rights as to A.J.G.*, 122 Nev. 1418, 1423, 148 P.3d 759, 762 (2006). This court has held that "[a]lthough the best interests of the child and parental fault are distinct considerations, the best interests of the child necessarily include considerations of parental fault and/or parental conduct." *In re N.J.*, 116 Nev. 790, 801, 8 P.3d 126, 133 (2000). Because the termination of parental rights "is an exercise of awesome power that is tantamount to imposition of a civil death penalty," a district court's order terminating

---

[2]Because Keaundra was not offered immunity in this case, we decline to address whether such immunity could avoid a Fifth Amendment violation.

SUPREME COURT
OF
NEVADA

(O) 1947A

parental rights is subject to close scrutiny. *In re A.J.G.*, 122 Nev. at 1423, 148 P.3d at 763 (internal quotation marks omitted). This court reviews the district court's findings of fact for substantial evidence. *Id.*

*The district court abused its discretion in concluding that terminating Keaundra's parental rights was in the children's best interests*

Keaundra argues that the district court's reasoning for determining that it was in the best interests of the children to terminate her parental rights remains unclear. She argues that it is unclear whether that decision was based upon the presumption under NRS 128.109(2) or, if that presumption had been rebutted, whether there was clear and convincing evidence that it was in the best interests of the children to terminate her parental rights. DFS argues that the district court applied the statutory presumption regarding the termination of parental rights because at the time of the second trial, the children had been in a placement for 58 months.

NRS 128.109(2) creates a presumption that termination of parental rights is in the best interests of the child where the child has been placed outside the home for 14 of any 20 consecutive months. To rebut this presumption, the parent must establish by a preponderance of the evidence that termination is not in the child's best interest. *In re Parental Rights as to J.D.N.*, 128 Nev. 462, 472, 283 P.3d 842, 849 (2012). "[D]eciding whether to terminate parental rights requires weighing the interests of the children and the interests of the parents." *In re N.J.*, 116 Nev. at 802, 8 P.3d at 134. NRS 128.107(2) further requires the district court to consider the "physical, mental or emotional condition and needs of the child and the child's desires regarding the termination, if the court determines the child is of sufficient capacity to express his or her desires."



We conclude that the district court erred by not considering the physical, mental, or emotional condition and needs of the children, nor the children's desires regarding the termination as required by NRS 128.107(2).

We further conclude that the record contains substantial evidence demonstrating that Keaundra overcame the presumption in NRS 128.109(2). For example, the record demonstrates that Keaundra maintained regular contact with the children after they were removed from her care and placed with her mother in Louisiana. Although she later moved to South Carolina for work, Keaundra continued to talk to the children on the phone several times a day, and her mother would bring the children to visit on a regular basis. A.D.L. repeatedly asked when she could go home to her mother and she would cry and beg to go home to her mother. The record also shows that Keaundra helped her mother support the children financially and sent gifts. Moreover, we note that after the district court's termination of Keaundra's parental rights in 2013, both children were forced to wait in foster care for 17 months before being placed with relatives in South Carolina, despite a formal request for such placement in April 2013.

Accordingly, because Keaundra was able to rebut NRS 128.109(2)'s presumption by a preponderance of the evidence, we conclude that the district court abused its discretion in concluding that termination of Keaundra's parental rights was in the best interests of A.D.L. and C.L.B., Jr.

*The district court abused its discretion in concluding that there was clear and convincing evidence of parental fault*

In its initial decision in 2013, the district court found that Keaundra made only token efforts in completing her case plan because she

 

failed to "address the risk factors and sequence of events that [led] to the physical injury" of C.L.B., Jr. Accordingly, the district court found that DFS raised a presumption that Keaundra only engaged in token efforts under NRS 128.109(1)(a), and that she failed to rebut the presumption. Upon remand, the district court reaffirmed its 2013 decision and held that "there have been no behavioral changes" in Keaundra "that would warrant return of [the] children to her care."

In addition to considering the child's best interest, the district court must make a finding regarding parental fault. NRS 128.105(1). Among the factors to be considered by the district court in a parental fault analysis are whether the parent is unfit or failed to adjust, NRS 128.105(1)(b)(3), (4); or only made token efforts to "support or communicate with the child," "prevent neglect of the child," "avoid being an unfit parent," or "eliminate the risk of serious physical, mental or emotional injury to the child," NRS 128.105(1)(b)(6)(I)-(IV). Pursuant to NRS 128.109(1)(a), a parent is presumed to have made only token efforts where a child is placed outside of the home "for 14 months of any 20 consecutive months." A presumption of failure of parental adjustment is raised "[i]f the parent or parents fail to comply substantially with the terms and conditions of a plan to reunite the family within 6 months after the date on which the child was placed or the plan was commenced." NRS 128.109(1)(b).

Keaundra argues that because she completed the case plan in all regards other than admitting to abusing C.L.B., Jr., the district court abused its discretion in determining that she did not substantially comply with the case plan. We agree. Our review of the record demonstrates that Keaundra complied with all other aspects of her case plan, such as



maintaining housing and employment, maintaining contact with her children and DFS, providing financial support for her children, and completing assessment and therapy to the satisfaction of the therapist. In fact, DFS reported that Keaundra had completed her case plan in all respects apart from the admission of physical abuse and DFS agreed that Keaundra had the knowledge and tools to effectively parent the children.[3] Based on the substantial evidence in the record, we conclude that the district court abused its discretion when it found that Keaundra did not rebut the presumptions in NRS 128.109(1)(a) and (b) by a preponderance of the evidence and thus terminated her parental rights.

## CONCLUSION

In reaffirming its decision that terminating Keaundra's parental rights was in the best interests of A.D.L. and C.L.B., Jr., the district court based its findings squarely on the fact that Keaundra refused to admit that she caused C.L.B., Jr.'s injury, which we conclude was a violation of Keaundra's Fifth Amendment rights. We further conclude that Keaundra was able to rebut NRS 128.109(1) and (2)'s presumptions by a preponderance of the evidence. In the absence of these presumptions, we conclude that there was not substantial evidence supporting the district court's findings of parental fault and that termination of Keaundra's parental rights was in the best interests of A.D.L. and C.L.B., Jr. Accordingly, we conclude that the district court's

---

[3]Although in closing arguments counsel for DFS argued that Keaundra has failed to complete her case plan, the September 13, 2011, Report for Permanency and Placement Review from DFS states that Keaundra "has successfully completed her case plan and has the knowledge and tools to effectively parent her children."

 

order terminating Keaundra's parental rights was an abuse of discretion and we thus reverse.

_____, J.
Hardesty

We concur:

_____, J.
Parraguirre

_____, J.
Stiglich