132 Nev., Advance Opinion 52

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| RAYMOND RIAD KHOURY, Appellant, vs. MARGARET SEASTRAND, Respondent. | No. 64702 **FILED** JUL 2 8 2016 TRACIE K. LINDEMAN CLERK OF SUPREME COURT BY_____ CHIEF DEPUTY CLERK |
| RAYMOND RIAD KHOURY, Appellant, vs. MARGARET SEASTRAND, Respondent. | No. 65007 |
| RAYMOND RIAD KHOURY, Appellant, vs. MARGARET SEASTRAND, Respondent. | No. 65172 |

Consolidated appeals from a district court judgment, pursuant to a jury verdict, and post-judgment orders awarding costs and denying a new trial in a personal injury action. Eighth Judicial District Court, Clark County; Jerry A. Wiese, Judge.

*Affirmed in part, reversed in part, and remanded.*

Hall Jaffe & Clayton, LLP, and Steven T. Jaffe, Las Vegas; Harper Law Group and James E. Harper, Las Vegas; Houser & Allison, APC, and Jacob S. Smith, Las Vegas; and Lewis Roca Rothgerber Christie LLP and Daniel F. Polsenberg, Joel D. Henriod, and Abraham G. Smith, Las Vegas; for Appellant.

SUPREME COURT
OF
NEVADA

(O) 1947A

11/3/16: Corrected per letter to publishers. CJ

16-23415

Richard Harris Law Firm and Alison M. Brasier, Benjamin P. Cloward, and Richard A. Harris, Las Vegas, for Respondent.

---

BEFORE THE COURT EN BANC.[1]

## OPINION

By the Court, SAITTA, J.:

As any trial attorney is aware, the jury voir dire process can be as important to the resolution of their claim as the trial itself. In this case we are asked to consider whether an attorney may ask prospective jurors questions concerning a specific verdict amount to determine potential bias or prejudice against returning large verdicts and whether repeatedly asking questions about that specific verdict amount results in jury indoctrination warranting a mistrial. We also consider the question of when a district court abuses its discretion in dismissing jurors for cause under *Jitnan v. Oliver*, 127 Nev. 424, 254 P.3d 623 (2011).

We hold that while it is permissible for a party to use a specific award amount in questioning jurors regarding their biases towards large verdicts, it is the duty of the district court to keep the questioning within reasonable limits. When the district court fails to do so, this can result in reversible error due to jury indoctrination. We also distinguish our holding in *Jitnan* to emphasize that a juror's statements must be taken as a whole when deciding whether to dismiss for cause due

---

[1]The Honorable Ron Parraguirre, Chief Justice, voluntarily recused himself from participation in the decision of this matter.



to bias. Just as detached language considered alone is insufficient to establish that a juror is *unbiased*, it is also insufficient to establish that a juror is *biased*.

In the current case, we hold that, while troubling, the plaintiff's questioning of the jurors during voir dire did not reach the level of indoctrination. Furthermore, we hold that the district court abused its discretion by dismissing for cause five jurors because their statements, when taken as a whole, did not indicate that they were biased against large verdict amounts. However, the district court's error was harmless. Next, the district court did not abuse its discretion by admitting opinion and causation testimony by respondent's treating physician, by admitting testimony by respondent's expert witness, or by excluding evidence of the amount that respondent's medical providers received for the sale of her medical liens. However, the district court did abuse its discretion by excluding evidence of the medical lien's existence to prove bias in Seastrand's medical providers, but the error was harmless. Lastly, we hold that the district court abused its discretion by awarding respondent expert witness fees in excess of $1,500 per expert because it did not state a basis for its award. Therefore, we reverse the district court's decision as to the award of expert witness fees and remand to the district court with instructions to redetermine the amount of expert witness fees and, if greater than $1,500 per witness, to state the basis for its decision.

## FACTUAL AND PROCEDURAL HISTORY

Respondent Margaret Seastrand and appellant Raymond Riad Khoury were in an automobile accident where Khoury's car rear-ended Seastrand's car. Following the accident, Seastrand received extensive treatment to both her neck and back, including surgeries. Seastrand

brought the underlying personal injury action against Khoury to recover damages.

Khoury stipulated to liability for the accident, and the only issues contested at trial were medical causation, proximate cause, and damages. Khoury argued that Seastrand's injuries leading to the surgeries were preexisting and were not caused by the accident. During voir dire, Seastrand stated that she was seeking $2 million in damages and was permitted to question the jurors regarding whether they had hesitations about potentially awarding that specific verdict amount. After this questioning, the district court granted Seastrand's motion to dismiss several jurors for cause but denied Seastrand's motion to dismiss five other jurors for cause. However, the next day, the district court reconsidered its previous ruling and dismissed those five jurors for cause.

During trial, multiple expert witnesses testified, including Dr. Jeffrey Gross, a neurological expert, and Dr. William S. Muir, one of Seastrand's treating physicians. After a ten-day trial, the jury returned a verdict in the amount of $719,776. Seastrand then filed a memorandum of costs in the amount of $125,238.01 and a motion for attorney fees. Khoury opposed the motion and moved to retax costs. The district court granted in part Seastrand's motion for costs, awarding her $75,015.61, denied Seastrand's motion for attorney fees, and denied Khoury's countermotion to retax costs. Khoury then made a motion for a new trial, alleging various errors. The district court denied Khoury's motion. Khoury appeals from the judgment, the costs award, and the order denying his new trial motion.

Khoury raises the following issues on appeal: whether the district court abused its discretion by (1) denying Khoury's motion for a

mistrial due to jury indoctrination, (2) dismissing jurors for cause that displayed concerns about their ability to award large verdicts and/or damages for pain and suffering, (3) admitting causation and opinion testimony by one of Seastrand's treating physicians, (4) admitting testimony by one of Seastrand's expert witnesses that was outside the scope of his specialized knowledge and/or undisclosed in a timely expert report, (5) excluding evidence of the amount Seastrand's medical providers received for the sale of her medical liens, (6) excluding evidence of her medical liens, (7) refusing to grant a new trial following Seastrand's use of the word "claim" during opening arguments, and (8) awarding costs to Seastrand.

## DISCUSSION

### The voir dire process

Khoury argues that the district court abused its discretion by allowing Seastrand to voir dire the jury panel about their biases regarding large verdicts. Khoury contends that Seastrand's questioning indoctrinated the jury to have a disposition towards a large verdict. Khoury argues that by asking jurors if they were uncomfortable with a verdict in excess of $2 million, Seastrand's attorney "improperly implanted a numerical value in the minds of the jury as representative of plaintiff's damages *before* the jurors heard or considered any admitted evidence." Therefore, Khoury urges this court to "rule that such questions are *per se* improper."

The decision whether to grant or deny a motion for mistrial is within the trial court's discretion. *Owens v. State*, 96 Nev. 880, 883, 620 P.2d 1236, 1238 (1980).

*Questioning jurors during voir dire about specific verdict amounts is not per se indoctrination*

"The purpose of jury voir dire is to discover whether a juror will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Lamb v. State*, 127 Nev. 26, 37, 251 P.3d 700, 707 (2011) (internal quotation marks omitted). "While counsel may inquire to determine prejudice, he cannot indoctrinate or persuade the jurors." *Scully v. Otis Elevator Co.*, 275 N.E.2d 905, 914 (Ill. App. Ct. 1971).

Although we have not yet considered the issue of jury indoctrination in the civil context, we have considered it, albeit briefly, in criminal proceedings. *See Hogan v. State*, 103 Nev. 21, 23, 732 P.2d 422, 423 (1987); *see also Johnson v. State*, 122 Nev. 1344, 1354-55, 148 P.3d 767, 774 (2006). In *Hogan*, the court indicated that it was not an abuse of discretion for the district court to refuse to allow voir dire questions that were "aimed more at indoctrination than acquisition of information." 103 Nev. at 23, 732 P.2d at 423. In *Johnson*, the court indicated that allowing the State to ask "prospective jurors about their ability to carry out their responsibilities[,]" by sentencing the defendant to death, was within the district court's discretion. 122 Nev. at 1354-55, 148 P.3d at 774.

Other jurisdictions have considered the indoctrination issue in the civil context and have addressed the particular issue raised here—whether asking jurors if they have any hesitations about awarding a specific amount of damages results in indoctrination per se. In *Kinsey v. Kolber*, the Appellate Court of Illinois held that questioning jurors about specific verdict amounts was not indoctrination because it "tended to uncover jurors who might have bias or prejudice against large verdicts." 431 N.E.2d 1316, 1325 (Ill. App. Ct. 1982); *see also Scully*, 275 N.E.2d at

SUPREME COURT OF NEVADA

(O) 1947A

6

914 (suggesting that allowing the plaintiff to question jurors about specific amounts was not an abuse of discretion because "[s]ome prospective jurors may have had fixed opinions, which indicate bias or prejudice against large verdicts, and which might not readily yield to proper evidence." (internal quotation marks omitted)).

Alternatively, some jurisdictions have found that it is within the discretion of the district court to *refuse* to allow the plaintiff to ask questions about specific dollar amounts. This is because "they may tend to influence the jury as to the size of the verdict, and may lead to the impaneling of a jury which is predisposed to finding a higher verdict by its tacit promise to return a verdict for the amount specified in the question during the voir dire examination." *Trautman v. New Rockford-Fessenden Co-op Transp. Ass'n*, 181 N.W.2d 754, 759 (N.D. 1970); *see also Henthorn v. Long*, 122 S.E.2d 186, 196 (W. Va. 1961). However, these courts did not state that questions about specific dollar amounts were per se improper; rather, the courts in these cases merely held that it was within the district court's discretion to refuse to allow the plaintiff to ask questions about specific dollar amounts. *See Trautman*, 181 N.W.2d at 759 ("It is well within the trial court's discretion to sustain objections to such questions."); *Henthorn*, 122 S.E.2d at 196 ("While jurors may be interrogated on their *voir dire* within reasonable limits, to elicit facts to enable the litigants to exercise intelligently their right of peremptory challenge, the nature and extent thereof should be left largely to the discretion of the trial court." (internal quotation marks omitted)).

We agree with other courts that have considered this issue and do not find the use of specific dollar amounts in voir dire to be per se improper. Indeed, it may be appropriate to use a specific amount in order

to discover a juror's biases towards large verdicts. Simply asking jurors about their feelings regarding "large" awards or some similarly vague adjective may be insufficient to determine if a juror has a preconceived damages threshold for a certain type of case. A juror may consider himself or herself capable of awarding a verdict of $100,000, a verdict which in ~~their~~ his or her mind may be fabulously large, but be unable to follow the law and award a verdict with another zero attached. Therefore, we hold that allowing a party to voir dire the jury panel regarding a specific verdict amount is within the district court's discretion.

*Courts should remain vigilant of the danger of indoctrination during voir dire*

During the three-day voir dire, Seastrand's attorney asked the jurors the following question:

> I'm going to be brutally honest with you folks right now. I'm going to say something that's a little uncomfortable for me to say. My client is suing for in excess of $2 million, and that's—you know, that's—that's what it is, and I'm putting that out there. I'm just going to be brutally honest about that. And I know that some of you folks, you know, you had different views and different beliefs in—in the jury questionnaire, and that's fine. But I want to talk about that right now.
>
> So who here is a little uncomfortable, even if it's just a little bit, with what I just said?

Seastrand's attorney did not stop there, however. He repeatedly brought up the $2 million verdict amount with each individual juror. In his quest to discover the jurors' feelings on that specific verdict amount, the record indicates that his actions bordered on badgering. One juror stated that Seastrand's attorney had used a "bullying tactic" in his "overemphasis on

money" ~~which~~ that "left a very bad taste in [his] mouth." The record also reflects that the questioning almost reduced another juror to tears.

Although our review of the voir dire transcript indicates that it was aimed more at acquisition of information than indoctrination, it was uncomfortably close. If the conduct by Seastrand's attorney had been allowed to become any more egregious, it would have reached the level of reversible error due to jury indoctrination. We take this opportunity to remind district court judges of their role in carefully considering the treatment of jurors during the selection process and the ultimate objective of seating a fair and impartial jury. However, we ultimately hold that the district court did not abuse its discretion in finding that the jury was not impermissibly indoctrinated in its denial of Khoury's motion for a mistrial.

*The dismissals for cause*

Khoury argues that the district court abused its discretion by misapplying *Jitnan v. Oliver*, 127 Nev. 424, 254 P.3d 623 (2011), to dismiss jurors for cause who expressed concerns about awarding a large verdict amount. Khoury argues that a juror's prejudice against large verdict amounts or pain and suffering damages is not a form of bias. Therefore, he maintains that the district court abused its discretion in dismissing for cause jurors displaying such a prejudice. Khoury further asserts that the district court abused its discretion by denying his motion for a mistrial on these issues. *See Owens*, 96 Nev. at 883, 620 P.2d at 1238.

During voir dire, the district court initially denied a motion to dismiss for cause five individual jurors. However, after reviewing our decision in *Jitnan*, the district court reconsidered its prior ruling and dismissed the five jurors for cause "in an abundance of caution" because "[e]ach one of them talked about the fact . . . that $2 million was too

SUPREME COURT
OF
NEVADA

(O) 1947A

much." In making its ruling, the district court was particularly concerned with whether the prospective jurors could state "unequivocally" that they did not have a preconception that a personal injury case could not support a large damages verdict. *See Jitnan*, 127 Nev. at 432, 254 P.3d at 629 (holding that "[d]etached language considered alone is not sufficient to establish that a juror can be fair when the juror's declaration as a whole indicates that she could not state *unequivocally* that a preconception would not influence her verdict." (emphasis added) (internal quotation marks omitted)). The district court stated that "the unequivocal language [in *Jitnan*] is the language that I keep coming back to and in order to avoid the potential of bias or prejudice, I'm going to exclude them all."

*A juror's bias against large verdict amounts or pain and suffering damages is a form of bias*

"[B]ias exists when the juror's views either prevent or substantially impair the juror's ability to apply the law and the instructions of the court in deciding the verdict." *Sanders v. Sears-Page*, 131 Nev., Adv. Op. 50, 354 P.3d 201, 206 (Ct. App. 2015).

Here, jurors were dismissed for cause on the grounds that they indicated they were predisposed against awarding a large amount of damages or damages for pain and suffering and would not be able to apply the law and the instructions of the court to the evidence presented because of their preconceived views. Inability by a juror to apply the law and instructions of the court displays bias. Therefore, we next consider whether such a bias existed in the jurors dismissed for cause by the district court.

*The district court abused its discretion by dismissing jurors for cause that displayed a "potential" bias against large verdicts*

"A district court's ruling on a challenge for cause involves factual determinations, and therefore, the district court enjoys broad discretion, as it is better able to view a prospective juror's demeanor than a subsequent reviewing court." *Jitnan*, 127 Nev. at 431, 254 P.3d at 628 (internal quotation marks omitted).[2] In *Jitnan*, we stated:

> In determining if a prospective juror should have been removed for cause, the relevant inquiry focuses on whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Broadly speaking, if a prospective juror expresses a preconceived opinion or bias about the case, that juror should not be removed for cause if the record as a whole demonstrates that the prospective juror could lay aside his impression or opinion and render a verdict based on the evidence presented in court. But detached language considered alone is not sufficient to establish that a juror can be fair when the juror's declaration as a whole indicates that she could not state *unequivocally* that a preconception would not influence her verdict.

*Id.* at 431-32, 254 P.3d at 628-29 (emphasis added) (citations and internal quotation marks omitted).

---

[2]Khoury argues in his reply brief that the district court misinterpreted NRS 16.050 and that therefore the proper standard of review is de novo, not abuse of discretion. Because Khoury raises this issue for the first time in his reply brief, it is deemed waived and we do not consider it here. NRAP 28(c).

Here, the district court initially denied Seastrand's motion to dismiss five jurors for cause who had expressed concerns about awarding large verdict amounts and/or pain and suffering damages, but later stated under cross-examination by Khoury that they would be able to follow the law and award a large verdict amount and/or pain and suffering damages. However, the next day, the district court reconsidered its prior ruling and dismissed the jurors for cause, reasoning that "the unequivocal language [in *Jitnan*] is the language that I keep coming back to and in order to avoid the *potential* of bias or prejudice, I'm going to exclude them all." (Emphasis added.)

This statement encapsulates the district court's error. *Potential* bias is not a valid basis for dismissing a juror for cause. Jurors should only be excluded on the basis of an *actual* bias that prevents or substantially impairs the juror's ability to apply the law and the instructions of the court in deciding the verdict or for other grounds defined by statute. *See* NRS 16.050. It is clear from the district court's oral reasoning that it was focused on the last sentence of *Jitnan* and, specifically, the single word "unequivocally," while ignoring the context provided by the remainder of the paragraph in which it is contained. If potential bias was all that were required to dismiss a juror for cause, then *any* expression of doubt, no matter how small, by a juror would be grounds to dismiss for cause. Under such a standard, rehabilitation by the opposing party's attorney would be impossible. No matter how fervent a juror's statements indicating that the juror ~~they~~ could follow the law, the potential for bias would remain.

*Jitnan*, when read in context, states that jurors' statements expressing a potential bias are not enough, when taken alone, to mean



that they cannot "unequivocally" follow the law. 127 Nev. at 432, 254 P.3d at 629. While *Jitnan* only states that "[d]etached language considered alone is not sufficient to establish that a juror can be fair," this is also true for establishing whether a juror *cannot* be fair. *Id.* (internal quotation marks omitted). Jurors' statements must be taken "as a whole," and "[d]etached language, considered alone[,]" indicating that they may have difficulty awarding a large verdict amount is insufficient to demonstrate that they would be unable or substantially impaired in applying the law and the instructions of the court in deciding the verdict and thus actually biased against awarding large verdict amounts. *Id.* (internal quotation marks omitted).

After reviewing the voir dire transcript, we conclude that the district court got it right the first time when it refused to dismiss the five jurors for cause. Therefore, we hold that the district court abused its discretion by improperly dismissing jurors for cause whose statements, when taken as a whole, indicate that they could apply the law and the instructions of the court in deciding the verdict and thus were not actually biased.

*The error was harmless*

Khoury argues that excluding jurors for their biases against large verdict amounts was reversible error because it prevented the jury from being a fair cross-section of society. Khoury equates this to excluding jurors on the basis of political affiliation, which some courts do not allow.

Although we have not yet considered this issue, most jurisdictions have held that when the district court abuses its discretion in dismissing a juror for cause, it is not reversible error. *See Jones v. State*, 982 S.W.2d 386, 392 (Tex. Crim. App. 1998) ("The law in Texas for civil cases is like that of the federal courts and the courts of the other states. It

SUPREME COURT
OF
NEVADA

(O) 1947A

13

has long been the established rule in this state that even though the challenge for cause was improperly sustained, no reversible error is presented unless appellant can show he was denied a trial by a fair and impartial jury." (internal quotation marks omitted)); *see also Basham v. Commonwealth*, 455 S.W.3d 415, 421 (Ky. 2014) (holding that even when a trial court abuses its discretion in dismissing a juror for cause, it is not reversible error unless that abuse was "tantamount to some kind of systematic exclusion, such as for race"). This is because, unlike an abuse of discretion in *refusing* to dismiss a juror, which can result in a biased juror or jury, when the district court improperly strikes a juror, it "[does] not prejudice the [appellant]." If a "competent and unbiased juror was selected and sworn," the appellant had "a trial by an impartial jury, which was all it could demand." *N. Pac. R.R. Co. v. Herbert*, 116 U.S. 642, 646 (1886).

Khoury is unable to provide any persuasive authority to support his contention that improperly dismissing jurors with a perceived bias for cause is reversible error. Rather, Khoury relies on *Powers v. Ohio*, 499 U.S. 400, 422 (1991), which holds that dismissing jurors on the basis of race prevents a jury from being "a fair cross section of the community." We do not conclude exclusion on the basis of race to be comparable to exclusion due to a mistaken finding of bias. Likewise, we reject Khoury's argument that dismissing for cause due to bias against large verdicts is comparable to dismissing for cause due to political affiliations. While at least one court has held that "[a]ffiliations with political parties constitute neither a qualification nor disqualification for jury service," *State v. McGee*, 83 S.W.2d 98, 106 (Mo. 1935), it did not hold that dismissing for cause on this issue is reversible error. Therefore, we hold that the district

court's error was harmless and does not warrant reversal of the judgment or the order denying Khoury's new trial motion.

*Dr. Muir's testimony*

Khoury argues that Seastrand's treating physician, Dr. Muir, should have been precluded from testifying about the cause of Seastrand's injuries and his opinion on the treatment provided by Dr. Marjorie E. Belsky because Seastrand failed to conform to the testifying expert witness disclosure requirements in presenting Dr. Muir as a witness.

*The district court did not abuse its discretion by admitting Dr. Muir's testimony*

This court reviews the decision of the district court to admit expert testimony without an expert witness report or other disclosures for an abuse of discretion. *FCH1, LLC v. Rodriguez*, 130 Nev., Adv. Op. 46, 335 P.3d 183, 190 (2014) (reviewing for an abuse of discretion a district court's decision to allow physician testimony without an expert witness report and disclosure). "While a treating physician is exempt from the report requirement, this exemption only extends to 'opinions [that] were formed during the course of treatment.'" *Id.*, 335 P.3d at 189 (quoting *Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011)). "Where a treating physician's testimony exceeds that scope, he or she testifies as an expert and is subject to the relevant requirements." *Id.*

On direct examination, the following exchange occurred between Dr. Muir and Seastrand's attorney:

Q. Dr. Muir, No. 1, do you feel that there was an adequate workup of the patient prior to getting to you?

A. Yes.



Supreme Court
OF
Nevada

(O) 1947A



Khoury argues that Dr. Muir improperly opined on the reasonableness of Dr. Belsky's treatment in this exchange because Dr. Muir did not form this opinion during the course of his treatment of Seastrand.

At trial, evidence was presented supporting the contention that Dr. Muir's opinion of the workup of Seastrand by Dr. Belsky was formed in the course of Dr. Muir's treatment. Dr. Muir testified that Dr. Belsky referred Seastrand to him after the injections given by Dr. Belsky failed to cause her condition to improve. Dr. Muir testified that both he and Dr. Belsky believed that Seastrand's symptoms were caused by the same portions of the spine. Dr. Muir further testified that the injections given by Dr. Belsky "help[ed] to determine if a particular nerve is being irritated or maybe damaged." He testified that it is possible that "after a couple of injections, maybe the body has healed itself . . . [a]nd you can treat the problem in a less aggressive way or maybe it won't require any treatment after a period of time." Lastly, Dr. Muir testified that he took into consideration the course of treatment of other providers in making his diagnosis and treatment plan.

Dr. Muir's testimony indicates that the injections given by Dr. Belsky were helpful in determining which of Seastrand's nerves were damaged and whether aggressive treatment would be necessary. His testimony also indicated that his review of the treatment of other providers is helpful in making his diagnosis and treatment plan. Thus, Dr. Muir's testimony indicates that his opinion of Dr. Belsky's treatment was formed in the course of his own treatment. Therefore, we hold that

the district court did not abuse its discretion by admitting Dr. Muir's testimony as to whether Dr. Belsky's workup of Seastrand was adequate.[3]

*Dr. Gross's testimony*

Khoury argues that the district court abused its discretion by allowing Dr. Gross to testify about symptoms that Seastrand experienced before the accident, as such testimony was outside the scope of his specialized knowledge as a neurosurgeon and was an opinion that was not disclosed in Dr. Gross's expert report. Therefore, Khoury argues that the district court abused its discretion by admitting the testimony.

On direct examination, the following exchange occurred between Seastrand's attorney and Dr. Gross:

> [The court, repeating a question from Seastrand's attorney.] Is it more probable those findings were—of the numbness and tingling were coming from the neck or more probable it was from the heart event for which she had a positive stress test?
>
> [Dr. Gross]: It is more probable that the arm symptoms are unrelated to the neck and more likely related to the heart or anxiety or both.

Dr. Gross was referring to symptoms that Seastrand had prior to the accident giving rise to the current case. This was relevant because

---

[3]Khoury also argues that Dr. Muir's testimony as to causation regarding Seastrand's injuries was improper. However, because Khoury did not object to Dr. Muir's testimony on causation, he has waived this issue on appeal. *See In re Parental Rights as to J.D.N.*, 128 Nev. 462, 468, 283 P.3d 842, 846 (2012) ("[W]hen a party fails to make a specific objection before the district court, the party fails to preserve the issue for appeal.").

SUPREME COURT
OF
NEVADA

(O) 1947A

Khoury's defense was that Seastrand's injuries predated the accident, and thus, he was not liable for damages related to those injuries.

*The district court did not abuse its discretion by admitting testimony by Dr. Gross because it was not outside the scope of his specialized knowledge*

> To testify as an expert witness under NRS 50.275, the witness must satisfy the following three requirements: (1) he or she must be qualified in an area of "scientific, technical or other specialized knowledge" (the qualification requirement); (2) his or her specialized knowledge must "assist the trier of fact to understand the evidence or to determine a fact in issue" (the assistance requirement); and (3) his or her testimony must be limited "to matters within the scope of [his or her specialized] knowledge" (the limited scope requirement).

*Hallmark v. Eldridge*, 124 Nev. 492, 498, 189 P.3d 646, 650 (2008). These requirements are analogous to the requirement in federal law that the expert testimony "rests on a reliable foundation," which is that "the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014) (internal quotation marks omitted).

At trial, Dr. Gross testified that he was a board-certified neurological surgeon with a fellowship in spinal biomechanics. He regularly treats patients with "neck and back problems, including injuries and other causes of disk problems, nerve problems, spinal cord problems." When patients are first referred to him, he asks about their past history and other medical issues that they have had. He then does a physical examination, where if the patient appears to have a neck condition, he tests the neck, head, arms, and hands and reviews films and tests that

have been taken of the patient. Lastly, he uses the patient's past history and the results of the physical examination to "come up with the best diagnoses that match or correlate to all the findings[,]" so that "the treatment recommendations . . . [are] proper and correct, [and] rely on the proper diagnosis."

Thus, Dr. Gross typically uses patient histories and physical examinations to reach a diagnosis and decide whether neurological surgery is the proper treatment for the patient's diagnosis. In doing so, Dr. Gross tests the neck, head, arms, and hands. It follows, that in order to rule out neurological surgery as a treatment, Dr. Gross must determine the cause of the patient's symptoms and whether they result from something not neurologically related. Therefore, we hold that Dr. Gross's opinion that Seastrand's prior symptoms were "unrelated to the neck and more likely related to the heart or anxiety or both" rested on the reliable foundation of the knowledge and experience of Dr. Gross's neurological surgery practice and was therefore within the scope of his specialized knowledge.

*Dr. Gross's opinion was disclosed in a supplemental expert report*

Khoury argues that Dr. Gross was required to disclose his opinion that Seastrand's prior injuries were unrelated to the neck and more likely related to the heart or anxiety, or both, in an expert report but failed to do so.

NRCP 16.1(a)(2)(B) requires an expert's report to "contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions."

On September 29, 2012, Dr. Gross disclosed a supplemental report apparently made at least in part in response to disclosures by

Khoury's expert witnesses. Khoury's experts had made disclosures of their opinions of Seastrand's past medical records, including records from a doctor's visit Seastrand made on October 27, 2008. In his supplemental report, Dr. Gross stated that he had reviewed the past medical records, including the records from an October 27, 2008, doctor's visit and summarized that the records revealed that Seastrand had been "having left chest wall pain associated with numbness and tingling bilaterally in both arms." Dr. Gross then stated, apparently quoting directly from Seastrand's medical records, that the doctor's assessment of Seastrand during that visit "was '[a]typical chest pain, numbness, and anxiety.'"

Later in the report, Dr. Gross directly addressed an opinion proffered by Dr. John Siegler, one of Khoury's experts, of Seastrand's October 27, 2008, visit. Dr. Siegler had opined that Seastrand's doctor visits in 2007, where she was seen for back pain flare-ups, and, in 2008, where she "was seen for numbness and tingling radiating to both arms and shooting pain into the left arm," indicated that she had a "documented history of cervical and lumbar pain." Dr. Gross indicated that he disagreed with Dr. Siegler's opinion, stating that Dr. Siegler had "conveniently omit[ted] the fact that the records note that the episode of tingling to the upper extremities was related to chest pain and stress."

By disagreeing with Dr. Siegler's opinion that Seastrand had a documented history of cervical and lumbar pain, Dr. Gross proffered an opinion that Seastrand's symptoms during her October 27, 2008, doctor's visit were unrelated to the neck. He also appeared to endorse the doctor's assessment of Seastrand during her October 27, 2008, visit that her symptoms were related to chest pain and stress, by chiding Dr. Siegler for "conveniently omit[ting] th[is] fact." Therefore, we hold that the district

SUPREME COURT
OF
NEVADA

(O) 1947A

20

court did not abuse its discretion by allowing Dr. Gross to testify as to his opinion that Seastrand's prior injuries were unrelated to her neck.[4]

*The district court did not abuse its discretion by excluding evidence of the amount Seastrand's medical providers received for the sale of her medical liens*

At trial, Khoury attempted to introduce evidence of the amount Seastrand's medical providers received for the sale of her medical liens to a third party. Khoury sought to admit the evidence to prove the reasonable amount of Seastrand's medical costs. The district court refused to admit the evidence, finding that under the collateral source rule, it was per se inadmissible. Khoury now argues that the district court abused its discretion.[5]

---

[4]Khoury also appears to argue that Dr. Gross's expert reports were not timely disclosed and should have been excluded on that basis. However, Khoury does not specifically argue that any particular report was made outside NRCP 16.1(a)(2)(C)'s time limitations. Rather, he merely sets forth NRCP 16.1(a)(2)(C)'s time limitations without stating which report was untimely under which time limit. We thus decline to consider his argument. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (stating that this court "need not consider . . . claims" that are not "cogently argue[d]" or supported by "relevant authority").

[5]Khoury also argues that the district court erred by refusing to allow him to examine Seastrand's medical providers as to the reasonable value of Seastrand's medical care. However, this is a misrepresentation of the issue that was presented to and ruled upon by the district court. Khoury actually moved to limit Seastrand's presentation of past medical special damages at trial to amounts actually paid by or on behalf of Seastrand, *not* to examine Seastrand's treatment providers about the reasonable value of Seastrand's medical care. Because the arguments Khoury makes on this issue in his brief were not raised before the district court, Khoury has waived his right to make them on appeal. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) ("A point not urged in the

*continued on next page...*

*Evidence of the sale of Seastrand's medical liens is irrelevant to prove the reasonable value of Seastrand's medical costs*

Evidence of payments showing medical provider discounts, or write-downs, to third-party insurance providers "is irrelevant to a jury's determination of the reasonable value of the medical services and will likely lead to jury confusion." *Tri-Cty. Equip. & Leasing v. Klinke*, 128 Nev. 352, 360, 286 P.3d 593, 598 (2012) (Gibbons, J., concurring). This is because "[t]he write-downs reflect a multitude of factors mostly relating to the relationship between the third party and the medical provider, and not necessarily relating to the reasonable value of the medical services." *Id.*

Here, assuming that Seastrand's medical providers sold her liens to a third party for less than their face value, they are functionally similar to a write-down made to a third-party insurer. In both instances the medical provider negotiates with a third party to receive less than what they charged a patient to provide medical care. Therefore, in line with the discussion of write-downs in the concurrence in *Tri-County Equipment & Leasing*, which is analogous to the present issue, we hold that evidence regarding the sale of medical liens is likewise irrelevant to a jury's determination of the reasonable value of medical services provided. Thus, the district court did not abuse its discretion by excluding such evidence.

---

*...continued*
trial court, unless it goes to the jurisdiction of that court, is deemed to have been waived and will not be considered on appeal.").

*The district court abused its discretion by excluding evidence of Seastrand's medical liens to establish bias*

Khoury argues that the district court abused its discretion by excluding evidence of Seastrand's medical liens to prove bias on the part of Seastrand's treating physicians who testified at trial. Khoury contends that the district court incorrectly excluded that evidence under the collateral source rule.

*Evidence of the existence of medical liens to prove bias does not invoke the collateral source rule*

"The collateral source rule provides that if an injured party received some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." *Proctor v. Castelletti*, 112 Nev. 88, 90 n.1, 911 P.2d 853, 854 n.1 (1996) (internal quotation marks omitted). This court has also created "a *per se* rule barring the admission of a collateral source of payment for an injury into evidence for *any purpose*." *Id.* at 90, 911 P.2d at 854 (second emphasis added). This is because of the danger that "the jury will misuse the evidence to diminish the damage award." *Id.* at 91, 911 P.2d at 854. The question of whether evidence of a medical lien implicates the collateral source rule does not appear to have been considered before in Nevada.

"[A] medical lien refers to an oral or written promise to pay the medical provider from the plaintiff/patient's personal injury recovery." State Bar of Nev. Standing Comm'n on Ethics and Prof'l Responsibility, Formal Op. 31, (2005), *available at* http://nvbar.org/wp-content/uploads/Opinion-31-Client-Funds-Reissued_4-1-15.pdf (last visited May 9, 2016) (internal quotation marks omitted). Thus, a medical lien represents

something that the plaintiff has personally paid for his or her treatment, not compensation that a third party has paid to the plaintiff. Therefore, we hold that evidence of the existence of medical liens to prove bias does not invoke the collateral source rule.[6]

*The district court's error was harmless*

To be reversible, an error must be prejudicial and not harmless. NRCP 61. To demonstrate that an error is not harmless, a party "must show that the error affects the party's substantial rights so that, but for the alleged error, a different result might reasonably have been reached." *Wyeth v. Rowatt*, 126 Nev. 446, 465, 244 P.3d 765, 778 (2010).

Here, the probative value of the lien evidence is limited as to the issue of bias. The terms of Seastrand's medical liens indicate that she would owe the money to her medical providers whether or not she was successful in the lawsuit. Seastrand's medical providers were also paid for the time they spent preparing for trial and testifying in court, and Khoury was able to cross-examine the medical providers about any bias that resulted from these payments. In addition to the testimony of Khoury's two treatment providers, evidence was also presented by Seastrand's expert witnesses as to the causation of Seastrand's injuries. Lastly, Khoury has not presented any arguments or evidence to support a contention that the verdict in this case was close and that allowing him to

---

[6]However, we caution that this holding may not be used as a "backdoor" by parties to question a treatment provider about whether and to what amount it would write-down the amount of the medical lien in the event that the plaintiff loses his or her lawsuit. Such evidence could be used by the jury to diminish the damage award and would thus invoke the collateral source rule.

use evidence of Seastrand's medical liens to establish bias in Seastrand's treatment providers would have resulted in a different verdict. Therefore, we hold that the district court's error was harmless.

*The district court did not abuse its discretion by refusing to grant a new trial following Seastrand's use of the word "claim" during opening arguments*

Khoury argues that by using the word "claim" one time in her opening arguments, Seastrand improperly informed the jury that he had insurance coverage.

During opening arguments, Seastrand's attorney made the following statement in regard to a rollover auto accident in which Seastrand was involved ~~in in~~ (1981):

> But you'll hear from [Seastrand] and she'll tell you, yeah, in that rollover I was the passenger and I wasn't hurt. I went to the ER and the ER physicians checked me out, and then I went to a holistic doctor one or two times and then I didn't have any problems. *I didn't make a claim.* I didn't do anything like that. I didn't have any issues with it.

(Emphasis added.) This is the only time that Seastrand mentioned the word "claim" during opening arguments.

Khoury bases his argument on a mistaken belief that the word "'[c]laim' is uniquely an insurance term." However, claim has many other meanings. *Black's Law Dictionary*, for instance, defines claim as, among other things, "[a] demand for money, property, or a legal remedy." *Claim, Black's Law Dictionary* (8th ed. 1999). While this *could* mean an insurance claim, in context it could just as easily mean a claim of relief in a court of law. Furthermore, Seastrand's use of the word claim was in regard to a 1981 car accident. Thus, even if the jury *did* believe Seastrand

was talking about an insurance claim, it would only have indicated whether Seastrand or another party in the 1981 accident was insured, *not* whether Khoury was insured in the current case. Therefore, we hold that the district court did not abuse its discretion by refusing to grant Khoury's motion for a mistrial.

*The district court abused its discretion by awarding costs to Seastrand without stating a basis for its decision*

NRS 18.005, which defines recoverable costs, allows the recovery of "[r]easonable fees of not more than five expert witnesses in an amount of not more than $1,500 for each witness, *unless the court allows a larger fee after determining that the circumstances surrounding the expert's testimony were of such necessity as to require the larger fee.*" NRS 18.005(5) (emphasis added); *see also Gilman v. State, Bd. of Veterinary Med. Exam'rs*, 120 Nev. 263, 272-73, 89 P.3d 1000, 1006 (2004) (observing that a district court has discretion to award more than $1,500 for an expert witness's fees). When a district court awards expert fees in excess of $1,500 per expert, it must state the basis for its decision. *Frazier v. Drake*, 131 Nev., Adv. Op. 64, 357 P.3d 365, 378 (Ct. App. 2015).

The district court awarded $42,750 as expert witness fees for Seastrand's five expert witnesses. It did not state a basis for its award. Khoury argues that because the district court awarded expert witness fees that exceed $1,500 per witness, the district court abused its discretion under NRS 18.005(5). However, Khoury ignores the second half of NRS 18.005(5), which allows the district court to award a greater fee per expert witness if it determines that the higher fee was necessary. Nonetheless, because the district court awarded expert fees in excess of $1,500 without

Supreme Court
OF
Nevada

(O) 1947A

stating a basis for its decision, we hold that the district court abused its discretion.[7]

## CONCLUSION

While it is permissible for a party to use a specific award amount in questioning jurors regarding their biases towards large verdict amounts, it is the duty of the district court to keep the questioning within reasonable limits. Here, Seastrand's voir dire did not reach the level of reversible error on the basis of jury indoctrination. Furthermore, although the district court abused its discretion by dismissing jurors for cause whose statements, when taken as a whole, indicated that they could apply the law and the instructions of the court in deciding the verdict, this was harmless error. Accordingly, the district court was within its discretion in denying Khoury's motions for a mistrial and new trial on the grounds related to the voir dire.

Next, the district court did not abuse its discretion by allowing testimony from Dr. Muir because his opinions were formed during the course of his treatment of Seastrand. The district court also did not abuse its discretion by admitting the testimony of Dr. Gross because his testimony was within the scope of his specialized knowledge and was disclosed in a supplemental expert report. It also did not abuse its

---

[7]Khoury also makes a one-sentence argument that because trial preparation costs and costs for copies of medical records are not specifically listed as recoverable under NRS 18.005, they are a routine part of normal legal overhead, and the district court abused its discretion by awarding them. Because Khoury provides no further analysis or authority for his argument, we decline to consider this issue. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006).

SUPREME COURT
OF
NEVADA

(O) 1947A

discretion by excluding evidence of the amount that Seastrand's medical liens were sold for because it was irrelevant to the issue of the reasonable value of her medical care. However, it did abuse its discretion by excluding evidence of the existence of Seastrand's medical liens for the purpose of establishing bias in the testimony of her medical providers. Nonetheless, this error was harmless. Therefore, we hold that the new trial motion was properly denied. Lastly, the district court did not abuse its discretion by refusing to declare a mistrial due to Seastrand's use of the word "claim" in opening arguments because it did not improperly inform the jury that Khoury was insured.

However, the district court did abuse its discretion by awarding costs to Seastrand without stating a basis for its decision. Therefore, we affirm in part, reverse in part, and remand to the district court for further proceedings regarding costs.

_____, J.
Saitta

We concur:

_____, J.
Hardesty

_____, J.
Douglas

_____, J.
Cherry

_____, J.
Gibbons

SUPREME COURT
OF
NEVADA

(O) 1947A

PICKERING, J., concurring:

While I concur in the result, I do not join the majority's internally contradictory analysis of the medical provider lien sale evidence. To be clear, Seastrand was uninsured, which gave her doctors lien rights against her eventual recovery from Khoury. The evidence the district court excluded was that one or more of Seastrand's doctors sold his lien rights to a third party, presumably at a discount. Such a sale—assuming evidence of it had been proffered (it was not)—did not result in a discount to Seastrand. After the sale, Seastrand remained liable for the full amount the lien secured. Her liability just ran to the third party to whom the doctor sold the lien instead of to the doctor. Thus, this case does not present the medical provider discount, or write-down, issue between doctor and patient (or doctor and patient's insurer or benefit provider) that has divided courts elsewhere. *See, e.g., Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130, 1138, 1142-43, 1146 (Cal. 2011) (holding that a "plaintiff could recover as damages for her past medical expenses no more than her medical providers had accepted as payment in full from plaintiff and PacifiCare, her insurer," since costs must be incurred or paid by a plaintiff or her insurer to be recoverable as damages) (citing *Restatement (Second) of Torts* § 911 (1979)). It also does not implicate the collateral source rule discussed in *Howell* since Seastrand, being uninsured and fully liable, had no collateral source to which to look for payment of her medical expenses.

As five members of the court held in *Tri-County Equipment & Leasing v. Klinke*, 128 Nev. 352, 357-58 n.6, 286 P.3d 593, 596 n.6 (2012) (5-2), whether evidence of pre-negotiated provider discounts is admissible because it sets the outside limit of the special damages a plaintiff has

incurred or paid, or excludable under the collateral source rule, is a legal issue that is sufficiently nuanced and important that it should be left "for a case that [actually] requires its determination." Two justices, writing separately in *Tri-County*, would have reached and resolved the provider discount issue, rejecting *Howell*. *Id.* at 597-99 (Gibbons and Cherry, JJ., concurring). Inexplicably, today's majority quotes language from the two-justice *Tri-County* minority on the issue the *Tri-County* majority declined to reach. *See ante* 22. But this case has even less to do with the provider-discount/collateral-source-rule issue in *Howell* than *Tri-County*, for two reasons. First, as the majority acknowledges, *ante* 24, "The terms of Seastrand's medical liens indicate that she would owe the money to her medical providers whether or not she was successful in the lawsuit." With no provider discount *to the plaintiff or her insurer*, no question arises as to whether the amounts billed by the provider were "incurred or paid," removing much of the rationale for the rule announced in *Howell*. Second, Seastrand had no insurance. With no insurance and no provider-to-patient discounts, the collateral source rule, on which the two-justice *Tri-County* concurrence relied to reject *Howell*, does not apply, as today's majority also recognizes. *See ante* 23-24 ("a medical lien represents something that the plaintiff has personally paid for his or her treatment, not compensation that a third party has paid to the plaintiff.").

Given all this, it is not clear to me why the majority feels it necessary to address the relevance of provider discounts or write-downs. The price a third party pays to buy a lien from a doctor depends more on the third party's assessment of the plaintiff's chances in the litigation, including the strength of the plaintiff's claim and the solvency of the defendant, than the reasonable value of the doctor's services, and as such

SUPREME COURT
OF
NEVADA

(O) 1947A

2

has so little probative value and so much potential for distraction as to be excludable as irrelevant. I would resolve the relevance issue on this basis, rather than confuse our law with what is, in this case, dictum drawn from a minority opinion not joined by a majority of the justices on this court.

For these reasons, while I join the remainder of today's opinion, I do not join and concur only in the result as to the medical lien sale evidence.

_Pickering_ , J.
Pickering